*601
 
 OPINION
 

 By the Court,
 

 Maupin, J.:
 

 SUMMARY
 

 The estate of Elfreda Gardner (“the Estate”) obtained a favorable jury verdict against Dean Witter Reynolds, Inc. and Warren House, a stockbroker and senior vice president of Dean Witter, based upon a theory of conspiracy to commit conversion of securities.
 

 The jury awarded compensatory damages in the amount of $2,600,000.00, jointly and severally, against Dean Witter and House, and rendered separate punitive damage awards against Dean Witter and House in the respective amounts of $6,000,000.00 and $50,000.00. The district court, however, reduced the compensatory damage award to zero by applying equitable offsets for settlement payments received by the Estate from third parties. Notwithstanding the elimination of the compensatory damage verdict through the offsets, the trial court let the punitive damage awards stand.
 

 On appeal, the Estate makes several claims of error by the district court including: (1) improper limitation of the scope of the conversion claim; (2) improper admission into evidence of restitution made by third parties in connection with pretrial settlements that resulted in a reduced jury award; (3) improper imposition of equitable offsets against the jury award ultimately rendered; and (4) failure to award post-judgment interest on the punitive damage awards.
 

 On cross-appeal, Dean Witter and House contend that the portion of the judgment awarding punitive damages should be reversed in its entirety because: (1) there was no evidence of malice; (2) the punitive damage awards were excessive; and (3) the reduction of the compensatory damages to zero mandates that the punitive damage awards should be set aside as a matter of law. Dean Witter separately argues that proof elicited at trial was insufficient to sustain vicarious imposition of punitive damages against it.
 

 We conclude the district court erred in admitting evidence relating to restitution by third parties and in applying post-verdict equitable offsets. Thus, we reverse that portion of the district court’s judgment pertaining to compensatory damages and remand this matter for reinstatement of the compensatory damage award and the issuance of an additur. Finally, we affirm the judgment with respect to the awards of punitive damages.
 

 
 *602
 

 FACTS
 

 Jack Gardner, an attorney licensed in California, managed the legal, business, and personal affairs of his elderly aunt and uncle, Elfreda and Allen Gardner. These duties were performed pursuant to a personal employment agreement. Allen and Elfreda ultimately died testate leaving no children.
 
 [1]
 

 Prior to Allen’s death, he established the Allen F. Gardner Trust to provide interest income to Elfreda during her lifetime and, upon her death, the trust estate was to be gifted to the Gardner heirs (Jack, his two sisters, and their heirs). Jack Gardner and Pioneer Citizens Bank were co-trustees of the trust. Allen predeceased Elfreda and, at the time of his death, the Allen F. Gardner Trust assets exceeded $8,000,000.00. Elfreda’s Last Will and Testament left all of her real and personal property to Jack and his wife, Sue Gardner, except for money and securities which were bequeathed to Elfreda’s nieces and nephews (the “Stiegler heirs”).
 

 After Allen’s death, Elfreda lived alone. Ultimately, she became dependent upon nursing assistance for all of the activities of daily living. Although House testified that Elfreda was able to express concerns about the management of her financial affairs, one of her medical providers testified that her mental and physical condition was in a state of continued deterioration and that she ultimately became mentally incompetent and physically disabled.
 

 On October 11, 1989, Jack Gardner removed stock certificates held in Elfreda’s name from a First Interstate Bank safe deposit box, which was held jointly by Elfreda and Jack Gardner. Thereafter, Jack deposited the certificates with Dean Witter into an active asset account
 
 [2]
 
 for registration in Dean Witter’s street name.
 
 [3]
 
 Appellants allege that the value of the stock certificates at the time of the deposit exceeded $8,000,000.00. The valuation at that time was largely uncontested at trial.
 

 Donald Brooks, manager of Dean Witter’s Stateline office, testified that on October 13, 1989, he and Jack Gardner witnessed Elfreda affix her signature to all of the opening account documents. Brooks also testified that he notarized Elfreda’s signatures. However, two handwriting experts testified at trial that the signatures were not those of Elfreda, and that three different inks were used to execute the documents.
 

 
 *603
 
 One of the documents allegedly signed by Elfreda was a full trading authorization, which gave Jack Gardner authority over the account, including the power to sell corporate securities. Jack wrote approximately $1,600,000.00 in checks from the active asset account to purchase real and personal property, including “Hummel” figurines, model trains, fhrniture, gold coins, and real property in Douglas County, Nevada. Because Elfreda’s will left her real and personal property to Jack and Sue Gardner, and because all monies and securities were bequeathed to the Stiegler heirs, these transactions substantially depleted the portion of the estate gifted in Elfreda’s will to the Stiegler heirs. Most of the assets purchased with these proceeds were then held jointly in the name of Mr. and Mrs. Jack Gardner.
 

 Jack also used the original full trading authorization to transfer United Airlines stock, the primary asset in the account, to his own accounts at Dean Witter and to those of his friends, with a total of 8,488 shares being distributed. He also distributed 3,365 of the shares to the Stiegler heirs. After Elfreda’s death, Jack continued to transfer assets from Elfreda’s account into his personal account. Dean Witter allowed these transfers, despite its policy of freezing accounts upon the death of a client. Further, after Elfreda’s death, Dean Witter sold stock certificates from the account to pay off $903,508.52 in margin obligations incurred by Jack in connection with the active asset account in Elfreda’s name. House was the account executive who' serviced this account.
 

 In addition to the active asset account, Jack opened a separate precious metal account with Dean Witter in Elfreda’s name. It is uncontested that Jack forged the signatures required to open this account. House admitted notarizing the false signatures. The account was used to transfer gold coins to Jack Gardner at his California address.
 

 After Jack Gardner’s defalcations were identified, the Estate filed an action seeking damages against the Estate of Jack Gardner,
 
 [4]
 
 Sue Gardner, Pioneer Citizens Bank, trust counsel, Dean Witter, and House. The lawsuit alleged three separate loss categories, to wit: (1) losses incurred as a result of the handling of the Allen F. Gardner Trust, of which Elfreda was the income beneficiary during her lifetime; (2) losses stemming from the conversion of assets from Elfreda’s personal bank account at First Interstate Bank (“FIB”); and (3) losses sustained in connection with diversions from the Dean Witter accounts. The complaint alleged breaches of fiduciary duty, conversion before letters, conversion, embezzlement, civil conspiracy, and racketeering with
 
 *604
 
 regard to each separate loss category. Although the Estate’s pleadings alleged that all of the defendants named in connection with all three categories of loss were jointly and severally liable, the first two loss categories did not involve Dean Witter. Claims in connection with the third category were brought against the Estate of Jack Gardner, Sue Gardner, Dean Witter, and House.
 

 Prior to trial, Pioneer Citizens Bank and trust counsel each paid approximately $100,000.00 to settle, in part, the separate claims against the Allen F. Gardner Trust (the ‘ ‘Allen F. Gardner Trust Settlement”).
 

 Sue Gardner, individually and as executrix of the Estate of Jack Gardner, entered into a separate settlement agreement with the Estate of Elfreda Gardner in exchange for cash, real estate, and personal property valued by the parties in excess of $4,000,000.00 (the ‘‘Jack Gardner Settlement”). The Jack Gardner Settlement allocated net proceeds, after deductions of $400,000.00 for attorney’s fees, as follows: seventy-five percent for the depletion of Elfreda’s personal accounts (assets on deposit with FIB and Dean Witter); and twenty-five percent for monies Elfreda should have received from the Allen F. Gardner Trust. There was no specific breakdown in the settlement agreement allocating credit between the FIB and Dean Witter losses. Thereafter, the Estate proceeded to trial against Dean Witter and House.
 

 Prior to trial, the district court ruled on motions in limine brought to exclude evidence of the prior settlements. The district court granted the motion in part, prohibiting admission of evidence that real and personal property was returned by virtue of a legal settlement. The district court, however, allowed Dean Witter and House to introduce evidence that personal and real property, valued at approximately $1,570,858.00, was returned, including evidence that the Hummel figurines, model trains, and furniture were returned to the estate, along with several parcels of real property The district court also allowed Sue Gardner to testify that the value of the real property deeded back to the estate exceeded the original purchase price of the parcels.
 

 At trial, the district court limited the scope of the conversion claim by determining, as a matter of law, the time period within which the alleged conversion could have taken place. Specifically, the district court ruled that Dean Witter could not have converted the stock at the time that Jack Gardner removed the stock certificates from the FIB safe-deposit box and deposited them into the Dean Witter active asset account. Thus, the district court ruled that Dean Witter and House could only have been parties to the conversion at the time the stock was transferred from the active asset account. Because the corporate stock substantially decreased in value between the time of the deposit into the active asset
 
 *605
 
 account and the time of Jack Gardner’s transfer transactions, the district court restricted the compensatory damage claim to $4,173,079.00, including interest.
 
 [5]
 
 (Dean Witter and House conceded that certain irregularities perpetrated by Jack Gardner occurred, and that the value of the securities lost by virtue of the Jack Gardner transactions amounted to $4,173,079.00, including interest. However, Dean Witter and House vehemently denied participation in the conversion of securities or a conspiracy to convert securities from Elfreda’s accounts.)
 

 At the conclusion of the Estate’s case-in-chief, the district court dismissed all of the claims, pursuant to NRCP 41(b), except the causes of action alleging conversion and conspiracy to convert. The court further ruled that there was insufficient evidence as a matter of law to support an award of punitive damages based upon fraud or oppression, but left the question of malice for decision by the jury.
 

 The jury returned a verdict for the defense on the conversion claims but, as previously noted, returned a verdict of $2,600,000.00 in compensatory damages against Dean Witter and House jointly and severally for conspiracy to commit conversion. As also noted, the jury, in bifurcated proceedings, ultimately awarded the Estate punitive damages against Dean Witter in the amount of $6,000,000.00 and against House in the amount $50,000.00.
 

 Thereafter, following post-trial motions by both parties, the district court reduced the compensatory damage award to zero, applying offsets for the entirety of the Jack Gardner and Allen E Gardner Trust Settlements. The offsets were ordered notwithstanding the Estate’s argument that offsets in any amount were barred under NRS 17.225
 
 et seq.,
 
 and affidavit evidence presented by the Estate that: (1) the settlement offsets that could be legally applied in connection with the Jack Gardner Settlement, assuming the offsets were legally appropriate,
 
 [6]
 
 could not exceed $480,659.50; and (2) the payors under the Allen F. Gardner Trust Settlement were not joint tortfeasors with Dean Witter, but were subject to liability for an alleged separate tort of conversion from the separate Allen F. Gardner Trust.
 

 
 *606
 
 The punitive damage awards were reduced to judgment, even though the equitable offsets reduced the compensatory award to zero dollars. The district court refused the Estate’s request for post-judgment interest on the punitive damages award pursuant to Ainsworth v. Combined Insurance Company, 105 Nev. 237, 774 P.2d 1003 (1989).
 

 DISCUSSION
 

 Standard of review
 

 “Questions of law are reviewed de novo.” SUS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993). Here, the district court was required to resolve numerous issues in the context of long-existing ambiguities in our decisional and statutory law. These issues include when and how an act of conversion can be committed, the rights governing litigation between and among multiple parties in the context of claims alleging intentional misconduct, and the relationships between recoveries of compensatory and punitive damages. In reversing the trial court, we take this opportunity to clarify these ambiguities, with which the district court understandably encountered considerable difficulty.
 

 The Estate primarily seeks reinstatement of the $2,600,000.00 compensatory damage award, which was reduced to zero via the settlement offsets. The Estate also requests an additur to account for the reduction of the verdict by the jury caused by the admission of the restitution evidence. We will therefore address the Estate’s contentions as they relate to the primary relief sought in this appeal.
 

 Because the Estate seeks the clarification and application of doctrine in the context of claims of conversion and conspiracy to convert, a brief review of the tort of conversion under Nevada law is necessary.
 

 Conversion is “a distinct act of dominion wrongfully exerted over another’s personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights.” Wantz v. Redfield, 74 Nev. 196, 198, 326 P.2d 413, 414 (1958). Further, conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge.
 
 See id.;
 
 Bader v. Cerri, 96 Nev. 352, 357 n.1, 609 P.2d 314, 317 n.1 (1980). Whether a conversion has occurred is generally a question of fact for the jury
 
 See Bader,
 
 96 Nev. at 356, 609 P.2d at 317.
 
 [7]
 

 
 *607
 

 Prior settlements
 

 The district court allowed Dean Witter to present evidence demonstrating the reconveyance of three parcels of real property to Elfreda’s estate pursuant to the Jack Gardner Settlement. Dean Witter was also allowed, through the testimony of Sue Gardner, to inform the jury that the property returned to the Estate was worth more at the time it was deeded back than when it was purchased. In sum, the district court permitted evidence of the return of certain real and personal property totaling $1,570,858.00, which included the Hummel figurines, model trains, furniture, gold coins, and money spent by Jack on the acquisition of various pieces of real property.
 

 Dean Witter contends that the restitution evidence was relevant to mitigate the damages sustained by the Estate. In making this contention, Dean Witter refers us to our statement in
 
 Bader
 
 that “[t]he return of the property converted does not nullify the conversion^ but can] serve to mitigate damages.”
 
 Bader,
 
 96 Nev. at 356, 609 P.2d at 317. Alternatively, Dean Witter asserts that if the district court erred in admitting this evidence, any error was harmless.
 
 [8]
 
 We disagree.
 

 Although the fact that the Estate had settled its liability claims against Jack and Sue Gardner was not disclosed to the jury, the district court admitted evidence that real and personal property had been returned to the Estate. It did so under
 
 Bader’s
 
 statement that, in a conversion case, damages may be reduced or “mitigated” by payments or return of the converted property by the tortfeasor. The district court’s ruling on the admissibility of the restitution by Jack and Sue Gardner is problematic because of the context within which such evidence is admissible under
 
 Bader,
 
 and because of our subsequent ruling in Moore v. Bannen, 106 Nev. 679, 680-81, 799 P.2d 564, 565 (1990).
 

 
 *608
 
 Our statement in
 
 Bader
 
 that evidence of restitution is admissible for the purpose of showing mitigation of damages was made in reference to a matter where a single defendant charged with civil conversion had restored the property to the alleged victim of the conversion. The restitution in
 
 Bader
 
 was not, as here, made by a third party. Also, the evidence of “mitigation” in
 
 Bader,
 
 the restoration or release of a cattle brand back to the original owner, was relevant to show that consequential damages,
 
 i.e.,
 
 loss of use stemming from the original conversion, were not as great as alleged. Therefore, return of converted property would only “mitigate” consequential damages attendant to the loss of use of the converted property.
 

 Here, the sole measure of damages sought by the Estate was the value of the securities at the time of conversion plus interest. The Estate made no claim for consequential damages other than loss of interest. Here, the district court, rather than the jury, assessed the interest to which the Estate was entitled. We therefore conclude that the district court erred in admitting evidence of the conveyance and return of personal and real property because this restitution did nothing to mitigate consequential damages; rather, it allowed the jury to consider evidence of the value of property that was returned as an offset to the value of the property taken,
 
 i.e.,
 
 non-consequential damages. This, we also conclude, runs afoul of our ruling in
 
 Moore v. Barmen.
 

 In
 
 Moore,
 
 we held that, “where there has been a settlement between a plaintiff and one of several defendants, the jury may not be informed as to
 
 either
 
 the fact of the settlement or the sum paid.”
 
 Moore,
 
 106 Nev. at 680-81, 799 P.2d at 566 (emphasis added). Consistent with our decision in
 
 Moore,
 
 we now conclude that evidence of a portion of the consideration paid in settlement by third parties creates the same potential for confusion and speculation in the minds of the jurors as does evidence of the total consideration paid. We therefore hold that the restitution evidence was admitted below in error. Thus, to the extent that
 
 Bader
 
 would allow admission of such evidence in “mitigation” of non-consequential damages, it is hereby expressly overruled.
 
 [9]
 

 An examination of the record clearly shows that the mitigation evidence unduly influenced the outcome. Again, the court’s ruling limited the extent of damages to $4,173,079.00. The jury then awarded compensatory damages in the sum of $2,600,000.00. The net result was a compensatory damage verdict in an amount substantially less than the minimum damages actually sustained by the Estate.
 

 
 *609
 
 Accordingly, we conclude the district court erred in admitting the restitution evidence.
 

 Viability of the equitable offsets
 

 On appeal, the Estate argues that equitable offsets based upon the restitution payments should have been limited to payments made in connection with the Dean Witter losses, not losses in connection with the Allen F. Gardner Trust and the FIB accounts.
 
 [10]
 
 In addition to its claim of error that the equitable offsets should have been limited, the Estate contends in the alternative that
 
 any
 
 offset based upon restitution settlements made in response to the claims of intentional misconduct was improper under NRS 17.225
 
 et seq.,
 
 the Nevada “Contribution Among Tortfeasors” statute.
 

 Whether offsets should be permitted in any amount in the context of joint liability for intentional misconduct is the subject of a nationwide split of authority. Some courts have prohibited offsets under contribution statutes similar to those enacted by the Nevada legislature.
 
 See
 
 Klosterman v. Fussner, 651 N.E.2d 64, 68 (Ohio Ct. App. 1994) (likening the imposition of equitable credit to the collateral source rule).
 
 But see
 
 Hampton v. Safeway Sanitation Services, Inc., 725 S.W.2d 605 (Mo. Ct. App. 1987) (offsets applied in context of conversion claim under “contribution” statute). Other courts have split, as a matter of public policy, over whether general principles of equity prevent parties with “unclean hands” from obtaining equitable relief by way of offset.
 
 See generally
 
 Income Investors v. Shelton, 101 F2d 973, 974 (Wa. 1940) (discussing the doctrine of unclean hands). In response, courts applying offsets have concluded that the potential for double recovery by the claimant mandates that such offsets be imposed, even in the context of intentional misconduct of the party seeking relief.
 
 See
 
 Krusi v. Bear, Stearns & Co., 192 Cal. Rptr. 793, 798 (Ct. App. 1983) (conversion of securities by two stockbrokers).
 

 We conclude that, as a matter of law, intentional tortfeasors,
 
 *610
 
 including persons found liable in conversion and persons in conspiracy with them, may not apply credit from settlements by their joint tortfeasors (here, Jack Gardner) in reduction of judgments against them arising from the intentional misconduct.
 
 See
 
 Harriss v. Elliott, 565 N.E.2d 1041, 1044 (Ill. App. Ct. 1991).
 

 First, and fundamentally, payments made in settlement of an intentional tort claim and applied to reduce another tortfeasor’s payment of the claim by one of the joint tortfeasors would constitute equitable relief by way of an
 
 equitable
 
 setoff. Under the maxim that one seeking equity may not do so with “unclean hands,” an intentional tortfeasor by definition seeks such relief from a position of ineligibility for it.
 
 See Shelton,
 
 101 P.2d at 974.
 

 Secondly, we conclude that NRS 17.225 prohibits the application of such credit.
 
 [11]
 
 The act provides that “where two or more persons become jointly or severally liable in tort for the same injury to person or property . . . , there is a right of contribution among them.” NRS 17.225(1). Section (a) of NRS 17.245(1) provides that payments in settlement by one of two or more persons liable for the “same injury” does not discharge the liability of non-settling parties unless the terms of the settlement so provide. However, the payments reduce “the claim against the others to the extent ... of the consideration paid for it.”
 
 Id.
 
 While NRS 17.245(1) seems to mandate some of the credit sought by Dean Witter and applied by the district court, NRS 17.255 specifically provides that no right of contribution exists in favor of any tortfeasor who has intentionally caused or contributed to the injury sustained.
 
 [12]
 

 Reading NRS 17.225, NRS 17.245, NRS 17.255, and NRS 17.305 together, the prohibition against contribution in favor of persons liable in tort for intentional misconduct would make no sense if intentional tortfeasors were entitled to an equitable offset for settlements made by joint offenders. This is because the credit under NRS 17.245(1) would indirectly provide the non-settling
 
 *611
 
 intentional tortfeasor the same protection against overpayment that a direct right of contribution would provide. Thus, the contribution statute renders any reduction in the verdict, regardless of its source, invalid. Accordingly, the district court erred in its admission of “mitigation” evidence and in the imposition of post-verdict equitable setoffs.
 

 Our ruling on this issue has further significance to the dictum in
 
 Bader
 
 regarding restitution as evidence in mitigation of conversion damages. Not only is such evidence inadmissible under
 
 Moore,
 
 restitution payments by third parties cannot be utilized as an equitable offset to the verdict. Thus, insofar as
 
 Bader
 
 implies that a non-settling defendant in a conversion case may seek credit for third-party settlements post-verdict, it is expressly overruled.
 
 [13]
 

 We conclude that the legislative statement of policy in the Nevada “contribution” statutes prohibits one intentional tortfeasor from taking advantage of restitution made by another. To the extent that this long-standing public policy should to be overturned, we defer to the Nevada State Legislature.
 

 Based upon our conclusions that the restitution evidence was inadmissible and that the verdict rendered should not have been reduced via the equitable offsets, we remand this matter for reinstatement of the verdict rendered in the amount of $2,600,000.00, and for additur to increase the recovery of compensatory damages to a total of $4,173,079.00, plus interest.
 
 [14]
 

 Punitive damages
 

 Punitive damages are not designed to compensate a party but are awarded ‘ ‘for the sake of example and by way of punishing the defendant.” NRS 42.005(1). With respect to punitive damages, the district court instructed the jury that it could make such an award only upon a finding of malice. On cross-appeal; Dean Witter and House contend that: (1) malice was never proven; (2)
 
 *612
 
 the punitive damage award was excessive; and (3) the reduction of the compensatory damages to zero mandates that the punitive damage awards should be set aside as a matter of law. We will address each contention in turn.
 

 A.
 
 Proof of malice
 

 Nevada law requires clear and convincing evidence of malice before punitive damages may be recovered. NRS 42.005(1). “ A plaintiff is never entitled to punitive damages as a matter of right.’” Dillard Department Stores v. Beckwith, 115 Nev. 372, 380, 989 P.2d 882, 887 (1999) (quoting Ramada Inns v. Sharp, 101 Nev. 824, 826, 711 P.2d 1, 2 (1985)). Rather, where the district court has determined that the conduct at issue is, as a threshold matter, subject to civil punishment, the allowance or denial of exemplary or punitive damages rests entirely in the discretion of the trier of fact.
 
 See
 
 Smith’s Food & Drug Cntrs. v. Bellegarde, 114 Nev. 602, 606, 958 P.2d 1208, 1211 (1998); Ramada Inns v. Sharp, 101 Nev. 824, 826, 711 P.2d 1, 2 (1985), Accordingly, this court will not overturn an award of punitive damages supported by substantial clear and convincing evidence of malice.
 

 NRS 42.001(3) defines express or implied malice as “conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others.’ ’ There is substantial evidence in the record to support the jury’s finding that Dean Witter and House acted maliciously or with a conscious disregard of Elfreda’s rights.
 

 House testified that he falsely notarized a full trading authorization on the precious metals account and that he allowed Jack to transfer stock out of Elfreda’s account after her death, despite a Dean Witter policy requiring House to freeze her account. Additionally, there was evidence presented that would have supported an inference that House or Brooks either forged Elfreda’s active asset account documents or knew that they were forged. Indeed, although House and Brooks testified that Elfreda signed these opening documents granting Jack control over her account, two handwriting experts concluded that three different pens were used to sign these documents and that the signatures were not Elfreda’s.
 

 With respect to the jury instruction given on Dean Witter’s punitive liability, we first address the threshold matter of whether Dean Witter preserved this issue on appeal. The Estate contends that Dean Witter waived its right to appeal its liability for puni
 
 *613
 
 tive damages by failing to object to the vicarious liability instruction that was given to the jury. We agree, in part, with the Estate’s contention.
 

 A review of the record reveals that Dean Witter did not specifically object to the language of the vicarious liability instruction and failed to proffer the alternate theory of punitive liability based on a complicity theory.
 
 See, e.g.,
 
 Etcheverry v. State, 107 Nev. 782, 784-85, 821 P.2d 350, 351 (1991) (holding that the failure to object or request a special instruction precludes appellate review).
 

 However, at trial, Dean Witter did generally object to the giving of
 
 any
 
 punitive damage instruction on the grounds that it was unconstitutional and not supported by the evidence. In so doing, Dean Witter preserved the right to argue on appeal that there was not substantial evidence in support of the punitive damage claim based on the theory given at trial, namely malice and vicarious liability. The jury was instructed on a vicarious liability theory via jury instruction 15:
 

 Dean Witter Reynolds, Inc., is a corporation and as such can act only through its officers and employees. Any act or omission of an officer or employee within the scope of authority or employment is in the law the act or omission of such corporation.
 

 This instruction properly set forth a theory of punitive liability under Nevada law as it existed at the time of trial.
 
 [15]
 

 See Ramada,
 
 101 Nev. at 826, 711 P.2d at 2 (implying that either a vicarious or complicity theory of principal liability was appropriate). We therefore will review this matter to determine whether there was substantial evidence of vicarious liability.
 

 In the instant case, we conclude that there was substantial evidence to support a finding that Dean Witter was vicariously liable for the malicious acts of Brooks and House. First, Brooks was in charge of the daily affairs of the Stateline branch, held both the branch office manager license and a registered principal license, and was acting within the scope of his authority when he participated in the notarization of the full trading authorization. Second,
 
 *614
 
 House was senior vice president of Dean Witter and acted in the scope of authority as a manager of Elfreda’s account.
 

 Accordingly, in interpreting the evidence in a light most favorable to the Estate, we conclude that there was clear and convincing evidence in the record to support the jury’s finding that Dean Witter and House were liable for maliciously conspiring with Jack Gardner to convert Elfreda’s securities. Dean Witter and House contend that their acts were negligent at best, and that they were only complying with the requests by a person with authority to act on behalf of Elfreda Gardner. However, the record supports a finding that House and/or Brooks either forged or knew that Jack Gardner forged Elfreda’s signature on the active asset account documents, thus giving him' the power to transfer several million dollars worth of Elfreda’s assets from the active asset account.
 

 B.
 
 Excessiveness as a matter of law
 

 NRS 42.005(l)(a) limits the amount of punitive damages to three times the compensatory damages in instances where such damages are equal to or exceed $100,000.00.
 

 Further, in determining whether a punitive damages award is excessive, we consider numerous factors including the defendant’s financial position, culpability, and the extent to which this culpability offends one’s sense of justice.
 
 See
 
 Wohlers v. Bartgis, 114 Nev. 1249, 1267, 969 P.2d 949, 962 (1998) (citing Ace Truck v. Kahn, 103 Nev. 503, 509-10, 746 P.2d 132, 136-37 (1987)). Finally, this court considers the gravity of the injury suffered by the plaintiff and the means necessary to deter future similar conduct.
 
 See id.
 

 In the case at bar, we see nothing excessive about the $6,000,000.00 punitive award against Dean Witter. These awards are well within the statutory parameters of NRS 42.005, which would have permitted an award not to exceed $7,800,000.00, three times the compensatory damages award of $2,600,000.00. Further, these awards did not annihilate either Dean Witter or House; both awards constituted a relatively small portion of the net worths of these parties. Finally, there was substantial evidence, as discussed above, that proved misconduct resulting in the substantial depletion of the multi-million-dollar estate of their mentally and physically incompetent client.
 
 [16]
 

 
 *615
 
 C.
 
 Application of equitable offsets
 

 The district court applied equitable offsets to the compensatory damage award ultimately reducing the award to zero. Because punitive damages cannot be awarded unless compensatory damages are also awarded,
 
 [17]
 
 Dean Witter contends that the offsets removed the condition precedent to an award of punitive damages, to wit: an “award” of compensatory damages. We disagree.
 

 First, our ruling with regard to the equitable offsets restores the compensatory damage “award.” Second, we conclude that the term “award” in NRS 42.005 refers to an award of actual damages by the jury, not the net award calculated after equitable offsets.
 
 See
 
 Exxon Corp. v. Yarema, 516 A.2d 990 (Md. Ct. Spec. App. 1986). This is based upon the public policy consideration that a tortfeasor legally subject to civil punishment via punitive damages should not escape sanction, or have that sanction reduced, because of the actions of a third party. Thus, restitution made by a third party is irrelevant to whether a defendant’s conduct merits punishment.
 

 In the instant case, the jury awarded compensatory damages. Thus, appellants satisfied the rule requiring proof of actual loss before punitive damages may be recovered.
 

 Post-judgment interest
 

 Elfreda’s estate is entitled to post-judgment interest on the punitive damage award. We recently modified our previous ruling in Ainsworth v. Combined Insurance Company, 104 Nev. 587, 763 P.2d 673 (1988), and determined that post-judgment interest should accrue on an award for punitive damages, to compensate the plaintiff for the loss of the use of the money awarded in the judgment until paid.
 
 See
 
 Wohlers v. Bartgis, 114 Nev. 1249, 969 P.2d 949 (1998); Powers v. United Servs. Auto. Ass’n, 114 Nev. 690, 962 P.2d 596 (1998),
 
 modified on other grounds,
 
 115 Nev. 38, 979 P.2d 1286 (1999).
 

 CONCLUSION
 

 We conclude that the minimum compensatory damages sustained by the estate was $4,173,079.00 plus interest, that the evidence of restitution payments was improperly admitted, and that the imposition of equitable offsets was improper as a matter of law. We therefore reverse that portion of the judgment below per
 
 *616
 
 taining to compensatory damages and remand this matter to the district court for further proceedings consistent with this opinion. More particularly, we instruct the district court to amend the judgment via additur to reflect total compensatory damages sustained in the amount of $4,173,079.00 plus interest.
 
 See
 
 Drummond v. Mid-West Growers, 91 Nev. 698, 705, 542 P.2d 198, 203 (1975) (this court has set forth a two-prong test for additur: (1) whether the damages are clearly inadequate, and (2) whether the case would be a proper one for granting a motion for a new trial limited to damages). Finally, we affirm that portion of the district court’s judgment awarding punitive damages, and we further instruct the district court to calculate the post-judgment interest on the award.
 

 Rose, C. J., Young, Shearing, Agosti, Leavitt and Becker, JL, concur.
 

 [1]
 

 Allen F. Gardner died in 1985. Elfreda Gardner died in 1993.
 

 [2]
 

 An active asset account is a checking account into which stock dividends and other proceeds can be deposited; it authorizes the signatories to write checks on the margin, using the client’s stock as security.
 

 [3]
 

 The “street name” designation involves registration of client securities in Dean Witter’s name, thus allowing the firm to sell or transfer stock held for the client. Transactions are then memorialized via monthly statements.
 

 [4]
 

 Jack Gardner died prior to the trial of this matter.
 

 [5]
 

 As noted, the value of the securities at the time of the creation of the accounts approximated $8,000,000.00. The $4,173,079.00 figure was based upon the value of the securities at the time of ultimate transfer. Thus, the district court’s rulings had the effect of substantially reducing the Estate’s claim of damages.
 

 [6]
 

 The Estate’s primary argument in district court was that NRS 17.225 barred the imposition of any offsets. It argued in the alternative that the offsets should have been limited. On appeal, the Estate takes a reverse approach, to wit: the argument of total illegality of the offsets is made in the alternative to the argument that the offsets should have been limited.
 

 [7]
 

 As noted, the district court limited the scope of the Estate’s conversion claim by informing the jury that Dean Witter’s acceptance of Jack Gardner’s
 
 *607
 
 full trading authorization was not a conversion as a matter of law. This ruling had the net effect of reducing the damage claim based upon the value of the securities at the time of their transfers from the Dean Witter account, rather than their value at the time the account was created. As also noted, the value of the securities diminished almost by half during the period between the creation of the account and the ultimate transfers effected at the instance of Jack Gardner. We do not reach the issue of the timing of the conversion because the Estate primarily seeks reinstatement of the compensatory damage award plus additur.
 

 [8]
 

 The jury was not informed that Sue Gardner, Jack Gardner’s widow, was later given ownership of the Hummels, model trains, furniture and other personal property after they had been recovered and inventoried. Thus, the mitigation evidence was placed before the jury on a “fictive” basis as a precaution to prevent the jury from inferring that the “mitigation” evidence was actually a settlement payment.
 

 [9]
 

 Under
 
 Bader,
 
 restitution evidence offered in mitigation of consequential damages attendant to an act of conversion remains admissible.
 

 [10]
 

 In post-trial motions concerning the extent of the offsets, and thus, the net award from the verdict, the Estate provided affidavits memorializing allocations to the Allen E Gardner Trust losses and explaining the allocations between the Dean Witter and FIB losses. The district court, without holding an evidentiary hearing, assessed the restitution payments in total, thus reducing the net verdict to zero. We harbor some concerns with regard to the application of offsets in connection with settlements of claims not involving Dean Witter.
 
 See
 
 NRS 17.225(1);
 
 cf.
 
 Levi v. Montgomery, 120 N.W.2d 383 (N.D. 1963). However, we choose not to reach the issue in the context of this case because of our decision that the contribution statute, NRS 17.225
 
 et seq.,
 
 bars any right of equitable offset in favor of Dean Witter or House.
 

 [11]
 

 At common law, there was no contribution among joint tortfeasors. W. Page Keeton et al.,
 
 Prosser and Keeton on the Law of Torts
 
 § 50 (5th ed. 1984). This rule is deeply rooted in our national jurisprudential history and developed because the word “tort” was, in the non-modern context, a descriptive term for intentional misconduct amounting to a “civil wrong,” not negligent misconduct. Over time, numerous states have adopted either by court rule or by statute variant forms of contribution recovery. These contribution constructs, which apply to non-intentional wrongs, come from the recognition that non-negligent torts committed by multiple offenders do not evoke the same policy that justifies the prohibition of credit for complete or partial reimbursement by third parties in the intentional tort context.
 
 See
 
 2 Speiser, Krause and Gans,
 
 American Law of Torts,
 
 § 3:15 (1983).
 

 [12]
 

 The traditional restrictions against contribution by intentional wrongdoers that existed at common law are therefore retained.
 
 See supra,
 
 n.12.
 

 [13]
 

 In
 
 Bader,
 
 the “mitigation” evidence involved restitution by the defendant accused, not another separately accused defendant. Clearly, a defendant in any intentional tort case is entitled to credit for payments made on his own behalf. To this extent,
 
 Bader
 
 retains some limited vitality on the issue of restitution payments made by a tortfeasor.
 

 We note that some acts of conversion do not involve wrongful intent. In such a case, there is no reason not to impose equitable relief by way of offsets for third-party settlements. In this case, however, the jury found malice. Thus, equitable relief based upon third-party payments to the claimant is unavailable.
 

 [14]
 

 This total figure is based upon the value of the securities at the time of the transfers effected at the request of Jack Gardner. As noted, Dean Witter and House concede that the value of the securities at that time was $4,173,079.00.
 

 [15]
 

 We note that in 1998, after the trial of this matter, we rejected the application of “vicarious,” punitive liability and instead adopted the Restatement (Second) of Torts “complicity” theory of punitive liability.
 
 See Bellegarde,
 
 114 Nev. at 610-11, 958 R2d at 1214. We also note that, given the state of our punitive damage law as of the trial of this case, there was no ground upon which the district court could reject instructions based upon either theory. We conclude, however, based upon the analysis below, that a review of this case under a complicity theory of liability would not change the result.
 

 [16]
 

 We disagree with Dean Witter and House that their conduct was analogous to that of the corporate defendant in BMW v. Gore, 517 U.S. 559 (1996).
 

 [17]
 

 See
 
 Sprouse v. Wentz, 105 Nev. 597, 781 P.2d 1136 (1989); City of Reno v. Silver State Flying Serv., 84 Nev. 170, 438 P.2d 257 (1968); and Novack v. Hoppin, 77 Nev. 33, 359 P.2d 390 (1961).