Ginny V. WHITE; Jimmie D. White, Plaintiffs–Appellees,

v.

FORD MOTOR COMPANY, a Delaware corporation, Defendant–Appellant,

and

Orscheln Company, a Missouri corporation, Defendant.

No. 99–15185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 1, 2000.

Filed Dec. 3, 2002.

Andrew L. Frey (argued), Mayer, Brown, Rowe & Maw, New York, NY, Evan M. Tager and Miriam R. Nemetz (briefed), Mayer, Brown, Rowe & Maw, Washington, DC, and W. Chris Wicker (briefed), Woodburn & Wedge, Reno, NV, for the appellant.

Shanin Specter (argued), Kline & Specter, P.C., Philadelphia, PA, Don Nomura, Laxalt & Nomura, LTD., Reno, NV, for the appellees.

Before WOOD [1], KLEINFELD, and GRABER, Circuit Judges.

Opinion by Judge Kleinfeld; Partial Concurrence and Partial Dissent by Judge Graber.

## OPINION

KLEINFELD, Circuit Judge:

This decision addresses several issues, the most important of which relate to punitive damages.[2]

---

1. The Honorable Harlington Wood, Senior Judge for the Seventh Circuit, sitting by designation.

2. This decision had to await the Supreme Court's decision in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) and our decision in *Baker v. Exxon Corp (In re Exxon Valdez)*, 270 F.3d 1215 (9th Cir.2001).

## Facts

This case went to jury trial, but on the critical factual points, there is not much dispute. Where there is, the facts are of course taken favorably to the verdict.[3]

On October 9, 1994, Jimmie White parked his company's 1993 Ford F–350 pickup truck in his driveway. The driveway is sloped, not level, and the truck was parked on the slope pointing downhill. Mr. White testified that he put the truck into first gear, set the parking brake by stepping on the brake pedal, and went inside. He did not lock the truck.

The Whites' three-year-old son Walter was playing outside, with Mrs. White checking on him through the window from time to time. While she wasn't watching, Walter got into his father's pickup truck. The Whites' theory of the case was that Walter pulled or kicked it out of first gear into neutral. The gearshift lever is a long stalk sticking up from the floor. A piggy bank turned up under the seat after the accident, so Walter may have been clambering after his lost piggy bank. The parking brake didn't hold the truck after it was shifted from first to neutral, and it started rolling. Walter got out the passenger door, possibly falling out when the truck rolled over a bump. Tragically, the rear dual wheels of the truck rolled over the little boy's chest and killed him.

The Whites brought this products defect case against Ford and against Orscheln Company, which made the parking brake for Ford. The Whites alleged strict product liability (defective design), negligence, failure to warn, intentional misrepresentation, and negligent infliction of emotional distress. Orscheln settled during the trial. The jury came back with a verdict against

Ford for $2,305,435 in compensatory damages and $150,884,400 in punitive damages. The district court remitted the punitive damages to $69,163,037.10.

The plaintiffs' theory of the case was that the parking brake let go despite being set, and let the truck roll. Ford knew the parking brake was prone to failure, but kept selling it without recalling it and without warning consumers of the danger. Mr. White testified that if he had been informed that Ford had a problem with the parking brake sometimes letting go, he wouldn't have parked his truck on a slope, and if he'd been advised of a recall, he would have brought the truck in immediately to be fixed.

Ford offered alternative theories of how the accident could have occurred. One was that Mr. White had put the car in first gear but not pressed the parking brake down, and the little boy pulled the gear shift into neutral. If this is how the accident occurred, then the theory on which the Whites recovered damages, that the parking brake sometimes allowed trucks to roll despite being engaged and that Ford should have warned its customers, would be irrelevant to this accident. But taking the evidence most favorably to the plaintiff, we assume that the jury believed Mr. White's recollection that he had engaged the parking brake. Mr. White's account was bolstered by testimony that the boy couldn't have pulled the truck out of first gear into neutral, had the parking brake not been engaged, because when it was on a slope the force needed to pull it out of first was considerable.

Parking brakes work with a cable pulled by the pedal, a ratchet wheel, and a pawl. A pawl is a hinged or pivoted finger that

---

**3.** *See, e.g., United States v. Hicks,* 217 F.3d 1038 (9th Cir.), *cert. denied,* 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

sticks into a tooth of the ratchet wheel. Parking brakes tend to get loose over time, because the cable stretches. In the early nineties, Orscheln designed a parking brake for Ford that was self-adjusting, so that even as the truck aged, the parking brake would still stay tight. Ford started production in 1991 of model year 1992 F-series pickup trucks with the Orscheln self-tightening parking brake.

By 1990, Ford had pre-production reports of potential problems with the parking brake being designed for the 1992 F-series trucks. By the time the F-series trucks were in production, the reports had increased, from many different sources. Sometimes, customers reported, the parking brake pressed freely right down to the floor without engaging. Ford called this the "skip-through-on-apply" or "skip out" problem. Also, some customers reported that their trucks rolled despite the parking brake being engaged. Ford called this the "rollaway" problem.

Ford told Orscheln to figure out what was going wrong and fix it, and threatened to change suppliers if Orscheln couldn't fix it. Orscheln had a great deal of difficulty getting any parking brakes to fail in laboratory conditions, unless they subjected the brake to extraordinary abuse. In fact, Orscheln and Ford at first believed that the brake could not fail unless subjected to severe abuse. The evidence allowed for the conclusion that the reason why they couldn't easily replicate the failure was because it was a rare event or, alternatively, because it happened only with severe abuse. Of the roughly 785,000 1992 and 1993 F-series trucks with this brake, there were only 73 reports of skip-throughs or rollaways between 1992 and 1993, affecting about one truck in ten thousand.

In 1992, Ford established its own engineering group headed by a somewhat junior design engineer, Timothy Rakowicz, to try to figure out the problem. Following Orscheln's tests, by November 1992, Ford and Orscheln had narrowed in on the problem. Sometimes the tip of the pawl would slip over the tops of the teeth instead of engaging in one of the gaps between the teeth of the ratchet wheel. In April 1993, Mr. Rakowicz wrote a draft report saying that a "tip-on-tip" condition could cause disengagement of the parking brake and that this problem rendered the brakes "defective." Mr. Rakowicz wrote that this phenomenon could cause vehicles parked on an incline to roll down a hill, and that it warranted a field campaign and owner notification. But more senior engineers at Ford disagreed with the draft and required Mr. Rakowicz to tone it down, saying instead that the Orscheln test was not valid. Meanwhile, the evidence of problems with F-series brakes piled up, and by March 1993, the National Highway Traffic Safety Administration had become involved in the investigation, having received reports of rollaways.

By May of 1993, Orscheln had developed a fix. All it took was a plastic wedge over the pawl, to make sure it pressed down between the teeth instead of skipping over them. By August 1993, enough of the plastic wedges were manufactured so that Ford could install them in all the trucks on the road. Of course, if all the trucks on the road were modified with the wedge, it would also take the expense of notifying all the customers and paying for the shop labor to disassemble the truck enough to put in the fifteen cent plastic wedge. In addition to the expense, there were other reasons not to recall all the trucks and put in the wedge. The fix eliminated the self-adjusting feature of the parking brakes. Thus, with the fix installed, the skipovers and rollaways from this cause would be eliminated, but as the trucks aged, the parking brakes would get loose. Also, the

Orscheln engineers thought the "skip out" was more an inconvenience than a safety problem, because the user would feel the brake going to the floor with no resistance instead of engaging, and had only to release it and press it down again to get it to engage.

For these reasons, instead of recalling the pickup trucks, Ford issued a Technical Service Bulletin to dealers, in November 1993. The bulletin told dealers to install the wedges if customers complained. Meanwhile, though, reports of rollaways were continuing to accumulate, and the National Highway Transportation Office of Defect Investigation was pressuring Ford to recall the trucks. These problems were reported in only a tiny percentage of trucks sold, about one in ten thousand. But still, big pickup trucks rolling downhill without drivers are dangerous, even if only one of these had so far actually involved an injury.

The White truck rolled down the driveway and killed Walter White in October 1994. It had been purchased in September 1993. By then Ford had already figured out that there was a potential rollaway problem. At the end of August 1994, which was before the White accident, Ford decided to recall the pickup trucks to install the plastic wedges. But by the time the recall notice was formulated and mailed out to dealers, it was November, after the White accident. Thus the accident happened after the brake problem was discovered and figured out, after the technical bulletin to dealers had gone out, and after Ford had decided to recall the trucks to install the fix, but before the recall notices or any warnings to ultimate consumers were sent out.

In response to a form entitled "Special Verdict," the jury found that the brakes had a defective design but found that this defect was not a proximate cause of Walter White's death. The jury also found that the brakes were defective on account of Ford's failure to warn and that this defect was a proximate cause of Walter White's death.

## Analysis

### 1. Inconsistent verdicts

Ford's first argument is that the verdicts are inconsistent and, accordingly, require judgment for Ford as a matter of law. Here are the relevant verdicts, preceding the damages awards:

### SPECIAL VERDICT

 We, the jury in the above-entitled action, find as follows on particular questions of fact:

1. Was the product in question defective in design?

Answer: Yes _X_ No _____

If you answered "no" to Question 1, do not answer Question 2. If you answered "yes" to question[sic] 1, answer the next question.

2. Was this defect a proximate cause of the death of Walter White?

Answer: Yes _____ No _X_

3. Was the product in question defective for defendant Ford's failure to warn?

Answer: Yes _X_ No _____

If you answered "no" to Question 3, do not answer Question 4. If you answered "yes" to Question 2[sic], answer the next question.

4. Was the defect for failure to warn a proximate cause of the death of Walter White?

Answer: Yes _X_ No _____

5. Was defendant Ford negligent with respect to the product in question?

Answer: Yes _X_ No ___

If you answered "no" to Question 5, do not answer Question 6. If you answered "yes" to Question 5, answer the next question.

6. Was Ford's negligence a proximate cause of the death of Walter White?

Answer: Yes _X_ No ___

. . . .

10. Is Ford liable to plaintiffs' [sic] Jimmy [sic] and Ginny White for negligent infliction of emotional distress?

Answer: Yes _X_ No ___

11. Is Ford liable to plaintiffs [sic] Jimmy [sic] and Ginny White for intentional misrepresentation?

Answer: Yes _X_ No ___

Ford's theory is that once the jury found that the product defect did not proximately cause the death, the verdict had to be for no liability. As Ford reads this verdict, "the jury accepted plaintiffs' contention that the parking brake had a dangerous tendency to disengage spontaneously, but concluded that it *did not spontaneously disengage on this occasion.*"[4] If that is what the verdict necessarily means, then Ford is correct. A plaintiff cannot recover damages for injuries occasioned by the use of a defective product, where the product worked fine in his use and his injury was caused by something else.

The Whites argue that Ford waived its objection to inconsistency of the verdicts, because it did not object before the jury was discharged. Whether failure to object before discharge of the jury constituted waiver raises a potentially complicated issue under Federal Rule of Civil Procedure 49(b) and our decisions in *Los Angeles Nut House v. Holiday Hardware Corp.*[5] and *Home Indemnity Co. v. Lane Powell Moss & Miller.*[6] But we need not resolve the waiver issue because, assuming for purposes of discussion that Ford did not waive inconsistency, there was none.

As we explained in *Floyd v. Laws,*[7] "a court has a duty under the seventh amendment to harmonize" a jury's "seemingly inconsistent answers" if a fair reading allows for it.[8] In *Los Angeles Nut House,* we held that "the jury verdict must be upheld unless it is impossible to harmonize the answers under a fair reading," though we will not save the general verdict if that would "require us to torture a fair reading."[9] In an inconsistent verdict case, a court asks, not whether the verdict necessarily makes sense under any reading, but whether it can be read in light of the evidence to make sense.

In this case, Ford's reading is plausible: the brakes were defective, but they didn't fail here, and the jury was punishing Ford for making defective brakes and selling them to the general public even though the defect didn't cause this accident. But that isn't the only plausible reading. After reading the record, we agree with the district court that, as the case was presented to the jury, there was an alternative plausible understanding that makes sense of the verdicts.

The jury reasonably could have thought that this particular parking brake was defective and did let go, allowing the truck to

4. Brief for Appellant at 20, *White v. Ford Motor Co.,* 2002 WL 31687641 (emphasis in original).

5. 825 F.2d 1351 (9th Cir.1987).

6. 43 F.3d 1322 (9th Cir.1995).

7. 929 F.2d 1390 (9th Cir.1991).

8. *Floyd,* 929 F.2d at 1396.

9. *Los Angeles Nut House,* 825 F.2d at 1354.

run over Walter White. But the jury could nevertheless have concluded that the brake design defect wasn't the "proximate" cause of the death. The brake had been designed years before the accident, with many intervening events. The judge instructed the jury that "[f]or proximate causation to be established, you must find that the injury or damage to plaintiffs was the natural and probable consequence of the defendant's negligence or wrongful act, and that the injury or damage was foreseeable in light of the attending circumstances." The jury could have reasoned that the accident wasn't the "natural and probable consequence" of the brake design defect, because the natural consequence of a manufacturer's discovering a dangerous design defect would be to warn the customers and recall the product for a fix, rather than to leave the dangerous trucks on the street and leave the drivers ignorant of the hazard. Mr. White testified that, had he known that the brake could let go despite being set, he wouldn't have parked the truck on a slope.

That is approximately how the district court, having heard all the evidence, reconciled the verdicts. On our review of the evidence and arguments, it makes sense of the verdicts to us. There is no irreconcilable conflict.

## 2. Evidentiary issues

 Ford argues that reversal is necessary because the district court erroneously admitted certain expert testimony and evidence of prior incidents. We review a district court's evidentiary rulings during trial, including its rulings on the admissibility of expert testimony, for abuse of

discretion,[10] and we reverse only where "such nonconstitutional error more likely than not affected the verdict."[11]

### a. Testimony of Dr. Campbell Laird

The Whites called Campbell Laird, Ph. D., as an expert witness. Dr. Laird's training and experience, mostly academic but including five years working for Ford Motor Company, was as a metallurgist. He was a professor of material science and engineering. He testified that that meant he taught about how steel is made and molded into useful shapes, how big a rail had to be to carry the weight of a railroad and how long it would last, the crystal structure of materials, and how materials break when stressed. The great majority of his many publications dealt with how materials break.

Dr. Laird was not an accident reconstruction expert. Nor did he have any training or experience to which he testified in designing or manufacturing products. He had never looked at a brake assembly before examining the Ford parking brake in this case and another related case. He did not do any experiments with the brake parts in this case. Although he examined them, he relied largely on the Orscheln tests and the Orscheln and Ford engineering departments' memoranda rather than on results of his own tests.

Dr. Laird examined the pawl and ratchet wheel of the Whites' truck's brake using a scanning electron microscope. He observed wear patterns indicating repeated tip-on-tip engagement. That meant that this particular brake had been repeatedly subject to the problem that Ford and Orscheln had discovered, of the pawl sticking

---

10. *See General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997);

*Metabolife International, Inc. v. Wornick*, 264 F.3d 832 (9th Cir.2001).

11. *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir.1999).

on the tip of a tooth instead of settling fully into the gap between teeth of the ratchet wheel. Ford does not dispute that this evidence was admissible.

Ford appeals admission over objection of two other opinions to which Dr. Laird was allowed to testify. He testified that the tip-on-tip engagement could produce spontaneous disengagement of the parking brake if the truck was "subject to perturbation," a fancy way of saying that the brake could let go if someone slammed the door or shook the truck. Second, he testified that such spontaneous disengagement of the parking brake occurred in this case, causing the rollaway that killed the Whites' child.

■ In considering *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[12] the district court concluded that under our decision in *McKendall v. Crown Control Corp.*[13] the *Daubert* factors for "gatekeeping" could not be applied to mechanical engineers. We had held in *McKendall* that the *Daubert* factors "are relevant only to testimony bearing on 'scientific' knowledge" and did not apply to an expert testifying on how a product ought to have been designed.[14] Our attempt so to limit *Daubert* was rejected by *Kumho Tire Co., Ltd. v. Carmichael.*[15] The Supreme Court there held that Federal Rule of Evidence 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge."[16] We recognized in *United States v. Hankey*[17] that *McKendall* was overruled to the extent that it held that *Daubert* did not apply to "non-scientific" testimony.[18] Thus *Daubert* and *Kumho Tire* did indeed require that the judge apply his gatekeeping role under *Daubert* to all forms of expert testimony, not just scientific testimony.[19] The Rule 702 inquiry under *Daubert*, however, "is a flexible one,"[20] and the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[21] We are required to apply an abuse of discretion standard to review of a district court's decision, "as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion."[22]

■ The trial judge thought the two opinions to which exception is taken on appeal were admissible under Rule 702. As to the first opinion, that the tip-on-tip engagement could produce spontaneous disengagement of the parking brake if the truck was "subject to perturbation," the judge was within his discretion. Although Dr. Laird had not done any of the experiments himself, his training would make him competent to read the Orscheln and

---

**12.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**13.** 122 F.3d 803 (9th Cir.1997).

**14.** *McKendall*, 122 F.3d at 806.

**15.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**16.** *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167.

**17.** 203 F.3d 1160 (9th Cir.2000).

**18.** *Hankey*, 203 F.3d at 1169 n. 7.

**19.** *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167; *cf. Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir.2001).

**20.** *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786).

**21.** *Id.* (citation and internal quotation marks omitted).

**22.** *Id.* at 152, 119 S.Ct. 1167; *see also Hankey*, 203 F.3d at 1166–67.

Ford reports, and those reports supported the opinion he gave.[23] It's hard to see how he was saying any more in this opinion than the Orscheln and Ford experimental results had said, ·which would make any error in admitting his opinion harmless.[24] The trial judge was also within his discretion in determining that such scientific bolstering as published articles in reference journals was not required, because there is no reason to suppose that this detail of parking brake manufacture was of general interest to the scientific community and would generate a peer-reviewed literature.[25]

The second opinion to which exception is taken is a close question. Dr. Laird testified that such spontaneous disengagement of the parking brake occurred in this case, causing the rollaway that killed the Whites' child. The foundation for this opinion was skimpy. Dr. Laird, well within his metallurgical expertise, identified wear on the ratchet wheel of the brake that showed repeated tip-on-tip engagement rather than the proper engagement. That justified the inference that even though the tip-on-tip engagement might be a one in ten thousand phenomenon as applied·to all the Ford pickup trucks, it had indeed happened on this particular truck.

The way Dr. Laird got from the metal wear, showing repeated tip-on-tip engagement, to his opinion on how the accident occurred, did not rely on his metallurgy expertise at all. He just relied on simple logic. He assumed, for purposes of his opinion, that Mr. White had parked on the sloping driveway, engaged the brake, and put the truck in first gear. Mr. White's testimony provided a basis for those assumptions. Dr. Laird testified, based on Mr. White's deposition testimony and an Orscheln engineer's reports, that the brake must have been engaged, because otherwise the little boy could not have moved the shifter from first gear to neutral. The brake must have let go after the car was shifted into neutral, because otherwise the truck would not have rolled. And the boy was probably too small to have disengaged the parking brake.

This opinion took advantage of Dr. Laird's expertise in metallurgy only for his knowledge that the particular brake had repeatedly engaged in the tip-on-tip position from which spontaneous disengagement could occur. Beyond that, Dr. Laird established no more foundation than anyone trained in any kind of engineering, or even a lay person not trained in engineering, would have to venture the opinion.

If Mr. White's testimony was correct, and we must assume that the jury so found, the truck did roll, despite being parked in first gear with the parking brake on. Dr. Laird did apply his metallurgical expertise and scientific procedures (electron microscopy) to which no objection is made on appeal, to determine that this brake had repeatedly been subject to the tip-on-tip phenomenon that, Ford and Orscheln had determined, could lead to spontaneous disengagement and a rollaway if the truck was disturbed. For the part of Dr. Laird's opinion not requiring special training or experience, arguably the district court had discretion to admit the opinion under Federal Rule of Evidence 701. The question is close. A layman, which is what an expert witness is when testifying outside his area of expertise,

---

**23.** *See, e.g., Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1421 (9th Cir.1998).

**24.** *E.g. United States v. Cordoba*, 194 F.3d 1053, 1056 (9th Cir.1999).

**25.** *Cf. Metabolife International, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir.2001).

ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion. We need not decide whether the district court abused its discretion in allowing the opinion into evidence in this case, because we reverse on other grounds.[26]

### b. Evidence of prior rollaways

Ford argues that the district court abused its discretion in admitting evidence of other rollaways. The court allowed another Ford pickup truck owner, Tammy Bobb, to testify by deposition that her truck had rolled despite the parking brake's being set, and allowed Dr. Laird to testify about the Bobb rollaway. The court also allowed the Whites to put an exhibit into evidence showing that Ford had received a number of customer complaints of rollaways. Ford's contention is that insufficient foundation to show substantial similarity was established and that the customer reports were hearsay.

A "showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect."[27] Minor or immaterial dissimilarity does not prevent admissibility.[28] We review a district court's decision to allow such evidence for abuse of discretion.[29]

Ford's theory of dissimilarity for the Bobb rollaway is that it was caused by a manufacturing defect, not the design defect at issue in this case. But the testimo-

ny about that was somewhat ambiguous. Dr. Laird testified that the spring that helps the pawl engage properly between the teeth was not up to specifications on the Bobb brake, but he also said that the design defect was the same and that he attributed the rollaway to the design defect. The district court was within its discretion in concluding that there was sufficient similarity to allow the evidence of the Bobb rollaway to go to the jury.

As for the customer reports, they were clearly admissible under the business records exception to the hearsay rule to show that Ford had notice of rollaways,[30] and the district court redacted reports of dissimilar rollaways and post-White accident rollaways. Ford argues that it was error to admit the reports for the truth of the matter asserted, because even if they were not hearsay for purposes of proving that Ford had received them, they were hearsay for purposes of proving what the customers reported about rollaways. We need not resolve whether this was error, because it was harmless.[31] Other evidence of rollaways such as government reports and Orscheln's experiments came in, and it is highly unlikely that the customer reports affected whether the jury believed that the tip-on-tip problem could and did cause rollaways.

### 3. Sufficiency of evidence for punitive damages

Ford argues that it was entitled to judgment as a matter of law on

**26.** While we were considering this decision and dissent, *Mukhtar v. California State University* —— F.3d —— (9th Cir.1992), came down. Because we reverse on other grounds, we do not reach the question whether *Mukhtar* would affect our analysis of the expert testimony issues.

**27.** *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir.1991).

**28.** *Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.*, 23 F.3d 1547, 1555 (9th Cir. 1994).

**29.** *Id.*

**30.** *See, e.g., United States v. Fuchs*, 218 F.3d 957, 965 (9th Cir.2000).

**31.** *United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir.1985).

punitive damages, because the evidence was insufficient to support an award. The district court ruled that "[t]here was sufficient evidence for a reasonable jury to find that the cure for the brake problem was known and in Ford's hands before the White vehicle was sold, and that Ford did not apply it." Ford argues that this was "utterly at odds with the evidence." We review de novo the district court's denial of a Rule 50(b) renewed motion for judgment as a matter of law.[32] The test is whether "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury."[33]

Ford argues that the evidence showed that it investigated the rollaway reports carefully and promptly turned the matter over to the brake manufacturer for investigation and remedy, but that the engineers disagreed on whether there was anything wrong with the design. Out of 884,000 vehicles using the brake, only three injuries occurred. There was evidence to support that view, and the jury could have so concluded. But it apparently· didn't. There was also evidence from which the jury could conclude that Ford knew the parking brake could engage in the tip-on-tip position and let a pickup truck roll away, didn't fix it, didn't recall it, and didn't warn drivers of the trucks, all prior to the White accident.

■ Ford concedes that the applicable legal standard is that the Whites had to prove by clear and convincing evidence that Ford acted with conscious disregard for the rights or safety of others. There are alternative and additional grounds for punitive damages under the Nevada stat-

ute, but we need not consider them, because the evidence was sufficient under the standard Ford concedes was applicable.

Although it certainly could have concluded otherwise, the jury could permissibly conclude that Ford knew a parking brake tip-on-tip engagement could result in a rollaway, and failed to warn people driving pickup trucks about the brake in conscious disregard of their safety (that is, knowing that someone could be injured or killed and deliberately failing to warn). The jury could have accepted Ford's case, that the engineers were hard at work trying to replicate and cure the problem, but they could also have accepted the plaintiffs' case, essentially that when the engineers had figured out the problem and the fix for it, Ford covered it up with a euphemistic notice to dealers, rather than consumers, instead of a plain warning and immediate recall. The jury could have accepted Ford's claims that "skip-through," where a person pressed the parking brake with his foot and felt no resistance, and rollaway, where the parking brake seemed to engage but didn't prevent the truck from rolling away, were two different things. It could also have accepted the evidence that they were both the same thing, failure of the pawl to drop properly between the teeth of the ratchet wheel. As for the small number of injuries, the jury could have concluded that it was so unlikely that an accident would occur that Ford should not be punished for it. Or it could accept the plaintiffs' case, that once Ford knew that pickup trucks could be rolling down hills without drivers behind the wheel, it was obvious that someone was likely to be killed if Ford didn't do something about it.

**32.** *See Johnson v. Paradise Valley Unified School Dist.,* 251 F.3d 1222, 1226 (9th Cir.), *cert. denied,* 535 U.S. 1055, 122 S.Ct. 645, 151 L.Ed.2d 563 (2001).

**33.** *See Forrett v. Richardson,* 112 F.3d 416, 419 (9th Cir.1997) (citing *Bank of the West v. Valley National Bank of Ariz.,* 41 F.3d 471, 477 (9th Cir.1994)).

The part of Ford's argument that gives us the most hesitancy is its citation to the Nevada authorities. The Nevada Supreme Court decision in *Maduike v. Agency Rent–A–Car*[34] affirmed the dismissal of a punitive damages claim. In *Maduike*, a young family driving a rental car on vacation reported a brake problem to the rental agency, but the agency refused to fix it, leaving the family stranded unless they drove the car home. They tried to do so and had an accident. The decision affirmed on the ground that no jury could have found that the car rental agency "subjected the Maduikes to 'cruel and unjust hardship with conscious disregard of the rights of the person.' "[35] Ford correctly says that the uncontradicted evidence showed that it exercised more care for the safety of its customers than did the car rental agency in *Maduike*.

Since *Maduike*, the Nevada Supreme Court has recognized in *Evans v. Dean Witter Reynolds, Inc.*,[36] that "Nevada law requires clear and convincing evidence of malice before punitive damages may be recovered."[37] The term "malice" is a specially defined term of art in Nevada law, and means something less than the ordinary definition, "a desire to harm others or to see others suffer."[38] A Nevada statute broadens malice to include "implied" malice, which covers not only "conduct which is intended to injure a person" but also "despicable conduct which is engaged in with a conscious disregard of the rights or safety of others."[39] The Nevada statute defines "conscious disregard" as "knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences."[40]

The Nevada Supreme Court, before *Maduike*, had upheld punitive damages in *Granite Construction Co. v. Rhyne*,[41] and *Maduike* does not cite or purport to overrule *Granite Construction*. In *Granite Construction*, a woman hit a bull on the interstate highway and sued a construction company that was supposed to have built a fence to keep livestock off the highway. The jury could have concluded that the construction company decided not to build the fence, despite its contractual obligation to the state to do so, in order to save time and money. The jury could also have concluded that the state had waived the fence requirement because no livestock were thought to be in the area and it wanted to avoid delay, and when the single bull was discovered, the construction company reasonably tried to find the owner and have him remove the bull. Taking the evidence most favorably to the verdict, however, the Nevada Supreme Court upheld the punitive damages on the ground that the construction company "consciously and deliberately disregarded known safety procedures" and was "guilty of malice, express or implied."[42]

We held in *Coughlin v. Tailhook Association*[43] that, under *Granite Construction*,

---

**34.** 114 Nev. 1, 953 P.2d 24 (1998) (per curiam).

**35.** *Id.* at 26–27 (citation omitted).

**36.** 116 Nev. 598, 5 P.3d 1043 (2000).

**37.** *Evans,* 5 P.3d at 1052.

**38.** Am. Heritage Dictionary 759 (2d College Ed.1985).

**39.** Nev.Rev.Stat. § 42.001(3) (1996).

**40.** Nev.Rev.Stat. 42.001(1) (1996).

**41.** 107 Nev. 651, 817 P.2d 711 (1991).

**42.** *Granite Construction,* 817 P.2d at 713 (citation and internal quotation mark omitted).

**43.** 112 F.3d 1052 (9th Cir.1997).

punitive damages were permissibly awarded against a hotel for failing to do anything about a rowdy party in which a woman was "attacked, groped, grabbed, and handled by a throng of men." [44] We held in *Coughlin* that the 1995 statutory amendment to the Nevada punitive damages statute "indicates that *Granite's* definition of 'malice, express or implied,' was correct," [45] and punitive damages could be awarded on the theory that "a 'conscious disregard for the safety of others' amount[s] to implied malice." [46]

The Nevada Supreme Court has not stated the principle of law that reconciles the Nevada authorities. After Maduike, the Nevada Supreme Court in *Dow Chemical Co. v. Mahlum* [47] vacated an award of punitive damages following its reversal of intentional tort claims against the defendant. [48] The Court's opinions in Maduike and *Dow Chemical* do not cite or discuss *Granite Construction*.

 We are bound by our interpretation of Nevada law in *Coughlin*. The interpretation we adopted there, that "a 'conscious disregard for the safety of others' amount[s] to implied malice," [49] allows for the punitive damages in this case, taking the evidence most favorably to the prevailing party. The White jury was asked "[d]o you find by clear and convincing evidence that Ford acted with oppression or malice in the conduct upon which you base your finding of liability for the death of Walter White?" and the jury answered "Yes." In addition to the jury's determination that Ford was liable on the basis of defective design, negligence, failure to warn, and negligent infliction of emotional distress, punitive damages are bolstered by the jury's special verdict finding of "intentional misrepresentation," which is an intentional tort and would both fall within *Evans* [50] and survive the Nevada Supreme Court's rejection of punitive damages in *Dow Chemical*. [51]

### 4. Excessiveness of punitive damage award and extraterritoriality

 Ford argues that errors in instructions require a new trial. We review a district court's formulation of jury instructions in a civil case for abuse of discretion. [52] Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading. [53] Prejudicial error results from jury instructions that, when viewed as a whole, fail to fairly and correctly cover the substance of the applicable law. [54]

The judge gave a Nevada pattern jury instruction to guide the jury's judgment on the amount of punitive damages, telling

---

44. *Coughlin*, 112 F.3d at 1054.

45. *Id.* at 1055–56.

46. *Id.* at 1056.

47. 114 Nev. 1468, 970 P.2d 98 (1998) (holding disfavored on other grounds in *GES, Inc. v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001)).

48. *Mahlum*, 970 P.2d at 113.

49. *Coughlin*, 112 F.3d at 1056.

50. 5 P.3d at 1052.

51. Thus we do not disagree with our dissenting colleague's position that the judgment and jury instructions conformed to Nevada law.

52. *See Neibel v. Trans World*, 108 F.3d 1123, 1129 (9th Cir.1997) (citing *Fikes v. Cleghorn*, 47 F.3d 1011, 1013 (9th Cir.1995)).

53. *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir.1996).

54. *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir.2001) (quoting *Chang v. Johns–Manville Sales Corp. (In re Asbestos Cases)*, 847 F.2d 523, 524 (9th Cir.1988), *cert. denied*, 122 S.Ct. 1609 (2002)).

the jury only to act "without passion or prejudice" and to consider reprehensibility and deterrence. The instruction said:

> Members of the jury, you've now heard the evidence of the financial condition of the defendant Ford Motor Company. Because you have answered yes to special verdict question number fifteen, you may, in your discretion, award punitive or exemplary damages against defendant Ford for sake of example and by way of punishment. Your discretion should be exercised without passion or prejudice. In arriving at any award of punitive damages, you are to consider the following: [o]ne, the reprehensibility of the conduct of the defendant; two, the amount of punitive damages which will have a deterrent effect on the defendant in light of defendant's financial condition. That's the complete jury instruction on punitive damages, and you'll have this instruction with you in the jury room.

Ford requested an instruction on extraterritoriality. It would have barred the jury from punishing Ford for impact other than on Nevadans:

> In determining the amount of punitive damages, if any, that is necessary for punishment and deterrence, you may consider only Defendant's wrongful conduct that has had an impact on the citizens of Nevada. You may not award any punitive damages for the purpose of punishing Defendant relative to the sale of vehicles in other States, or for the purpose of punishing or deterring De-

fendant's conduct outside the State of Nevada.

The district court refused to give this instruction, any part of this instruction, or anything equivalent.

Ford's argument for its "only Defendant's wrongful conduct that has had an impact on the citizens of Nevada" instruction was based on the federalism discussion in *BMW of North America, Inc. v. Gore*.[55] The Court held in *BMW* that "the federal excessiveness inquiry appropriately begins with an identification of the states' interests that a punitive award is designed to serve."[56] *BMW* involved deceptive trade practices and failure to disclose presale repairs that affected the value of a new car. The Court noted that "the States need not, and in fact do not, provide such protection in a uniform manner."[57] In addition to noting the diverse ways states had actually protected consumers from such deception, the Court noted such hypothetical policy choices that a state might make, such as "plausibly conclud[ing] that the administrative costs associated with full disclosure would have the effect of raising car prices to the State's residents."[58]

The Court in *BMW* imposed a territorial limitation on punitive damages in the interest of federalism. This federalism includes the flexibility for a state to have whatever policy it chooses, subject to constitutional and congressional limits. For that flexibility to exist, no state can be permitted to impose its policies on other states. Because no single state could "impose its own policy choice on neighboring

---

**55.** 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**56.** *BMW*, 517 U.S. at 568, 116 S.Ct. 1589. Because the Court said the inquiry "begins" with this federalism inquiry, this is where we begin. We reject the dissent's assumption that we ought to begin elsewhere, with the three criteria for excessiveness that the Court sets out subsequently in its opinion.

**57.** *Id.* at 569, 116 S.Ct. 1589.

**58.** *Id.* at 570 n. 14, 116 S.Ct. 1589.

States," the Court held that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." [59] Alabama, the Court held, "does not have the power ... to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the punishing state] or its residents," nor may it "impose sanctions on [a defendant] in order to deter conduct that is lawful in other jurisdictions." [60] Evidence of extra-territorial conduct, such as sales in other states, "may be relevant to the determination of the degree of reprehensibility of the defendant's conduct," [61] but admissibility of evidence of reprehensibility does not, under *BMW*, go the extra and substantial step of entitling a state to award enough money to deter conduct (or at least lawful conduct) in other states. [62]

**59.** *Id.* at 571–72, 116 S.Ct. 1589.

**60.** *Id.* at 572–73, 116 S.Ct. 1589.

**61.** *Id.* at 574 n. 21, 116 S.Ct. 1589; *see also Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1253 (10th Cir.2000).

**62.** *BMW* holds that "no single State could [enact a tort law policy for the entire Nation], or even impose its own policy choice on neighboring States .... [O]ne State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States." 517 U.S. at 571, 116 S.Ct. 1589 (internal citations omitted). The Court held squarely that "[t]he award must be analyzed in the light of [conduct that occurred within Alabama], with consideration given only to the interests of Alabama consumers, rather than those of the entire Nation." *Id.* at 574, 116 S.Ct. 1589. We are not free to ignore this holding, nor to decline to follow the reasoning by which the Court reached this result. While *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (intentional fraud in Alabama insurance company) and *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S.

The question whether a state can impose punitive damages sufficient to punish unlawful (as opposed to lawful) conduct in other states was left open by *BMW*. The Court noted in *BMW* that because "the verdict was based in part on out-of-state conduct that was lawful where it occurred, we need not consider whether one State may properly attempt to change a tortfeasor's *unlawful* conduct in another state." [63] We avoided the need to consider this question in *Neibel v. Trans World Assurance Co.*,[64] a RICO case involving fraudulent sale of insurance and sham tax shelters. Compensatory damages were $259,366, and we held that the $500,000 in punitive damages was "supported by [California's] interest in protecting its own consumers and its own economy" and that, considering the evidence and the amount, "it [was] clear that only California interests [were] involved." [65]

257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (interference with contractual relations in limited Vermont market), the cases upon which the dissent relies, dealt with purely in-state conduct engaged in by a limited number of in-state actors, *BMW* addresses exactly the situation in the case we have before us: tortious conduct on the part of a nationwide manufacturer, that reflected a nationwide policy, and that caused the same harm in all states. *BMW* tells us that we may not, as a matter of federal law, permit one state to punish such nationwide manufacturers for their conduct—actual or hypothetical—in other states.

**63.** *BMW*, 517 U.S. at 573 n. 20, 116 S.Ct. 1589.

**64.** 108 F.3d 1123 (9th Cir.1997).

**65.** *Neibel*, 108 F.3d at 1131 (internal quotation marks and citation omitted) (first alteration in original); *cf. Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1333 (11th Cir.1999) (embarking on *BMW* excessiveness analysis only after holding that the conduct being punished, acidic seepage into waterways, "occur[red] in a single state and that [the state's statutes] expressed a strong inter-

■ That means of avoiding the question is unavailable in this case. The evidence focused on the number of vehicles Ford sold nationally, and the number of parking brake failures reported nationally. The national evidence was not limited by any jury instructions or admonitions to limit its relevance to reprehensibility. The jury was permitted, despite Ford's request for instructions to cure this error, to award damages to vindicate the interests of all Ford pickup truck buyers everywhere. In essence, the jury was asked to measure damages by Ford's harm to the whole country.

Plaintiffs' closing argument sought damages that would punish Ford for its conduct toward consumers in all states, not just Nevada. Plaintiffs' attorney emphasized that "there are 884,000 people *in this country* who have these vehicles that got a letter that didn't tell them the truth as to why these vehicles were being recalled" and "your verdict for punitive damages must be loud enough so that it is on the front page of every newspaper tomorrow morning, so *every person in this country* knows, if they have that vehicle, they can take it into the shop and get it fixed." [66] Plaintiffs' attorneys told the jury that Ford knew its actions would cause deaths of children "across the country." Plaintiffs' attorney repeated the "across the country" phrase several times, using a repetitive mantra for emphasis, in his "send them a message" argument. The emotional argument wound up with plaintiffs' attorney's statement that he had prosecuted criminals in the district attorney's office for twenty years, and "[his] work hasn't changed so much after all." Nothing in the argument addressed how many trucks were sold in Nevada, and our attention has not been directed to any evidence about how many trucks were sold in Nevada. The entire thrust of the argument was that this Nevada jury now should vindicate the interests of all Ford truck owners everywhere with a verdict that would make the front page of every newspaper in the country, so that the chief executive officer and other top officers of Ford Motor Company would "pour[ ] out of their chairs like water and crumple[ ] on the floor." With this evidence and argument, and the denial of the instruction, we cannot conclude, as we did in *Neibel,* that even without the instruction, the jury plainly was vindicating only the state's interest in protecting its citizens or that it was addressing Ford's reprehensibility only in the case at bar.[67]

After the verdict, and in light of *BMW,* Ford moved for a remittitur based on excessiveness and on the extraterritoriality rule in *BMW.* The district court denied the motion on extraterritoriality, saying that Ford had not shown that its conduct would be legal in other jurisdictions. But the district court conceded that Ford had submitted materials arguing that "many states do not recognize a post-sale duty to warn and that at least five states would not permit punitive damages in this type of case." The district court attempted to distinguish *BMW* on the theory that the 884,000 pickup trucks Ford "marketed in North America was universal market conduct performed centrally; it was not pecu-

---

est in deterring environmental pollution"); *Deters v. Equifax Credit Info. Servs.,* 981 F.Supp. 1381, 1389–90 (D.Kan.1997) (noting that in action under federal statute, federalism concerns, which must otherwise be addressed, are not implicated in assessing constitutionality of punitive damages award).

**66.** Emphasis added.

**67.** *Cf. Ingersoll–Rand,* 214 F.3d at 1253.

liar to or necessarily performed in a given state."

But we cannot adopt that distinction. In *BMW*, BMW marketed its cars nationally, too, and the punitive damages in that case were imposed because BMW "had adopted a national policy in 1983 concerning cars that were damaged in the course of manufacture or transportation." [68] In that case, a national policy affected a sale of a car in Alabama, in this case a pickup truck in Nevada. No material difference. Thus in this case, the Nevada jury was asked to impose punitive damages to protect people in other states with Ford pickup trucks, and the district court refused to reduce the punitive damages on account of the extraterritorial aspect. The district court expressly rejected the argument that the award should be limited to punishment for the conduct that had taken place in Nevada. The court refused to limit the damages to vindication of Nevadans' rights because Ford's conduct was "performed centrally."

We cannot conclude that the ratio analysis by which the district court explained its remittitur limited the damages to vindicating the rights of Nevadans. The jury was encouraged by argument to award damages for Ford's wrongs to the entire country, and the court rejected an instruction that would have told the jury to vindicate only the wrongs done in Nevada. Possibly the jury would have chosen as large an award had it been told to vindicate only the rights of Nevadans, but possibly it would have chosen a substantially lower award. For all we know, the jury would have applied a much lower ratio than the thirty to one the court chose, or the sixty-six to one that the jury initially chose, had it been told that it should limit its scope to the interests of Nevadans. A punitive damages award that encompasses a defendant's extraterritorial conduct may be unconstitutional even if the size of the award itself, as compared to the compensatory damages, is not outside the bounds of due process. [69]

**68.** *BMW*, 517 U.S. at 563, 116 S.Ct. 1589.

**69.** The error was not one of formulation of jury instructions, but of substance. The plaintiff has produced extensive evidence of extraterritorial conduct, and in argument urged the jury to punish Ford for the extraterritorial conduct, not just the Nevada conduct. The substantive error was not one of Nevada law, but of federal constitutional law. The pre-*Gore* cases discussed by the dissent do not touch upon extraterritoriality, because the issue was not before the court in those cases. *Gore* does, in section II of the Court's opinion, which is prior to and separate from section III, which lays out the three criteria for excessiveness, reprehensibility, ratio, and sanctions for comparable misconduct. An award is unconstitutional if it violates the principles laid out in either section. The dissent concludes that the award violates the section III standards. We do not reach section III, because we conclude that it violates the section II standards.

In some cases, such as *Neibel*, no extraterritoriality instruction is needed, because it was

"clear that only California interests are involved." 108 F.3d at 1131. Ford's proposed instruction was less than complete as it stood, because, as we have explained, the jury may consider extraterritoriality insofar as it bears on reprehensibility of the conduct. "[S]uch evidence may be relevant to the determination of the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 574, n. 21, 116 S.Ct. 1589. Where we differ with the dissent is that there is no getting around the proposition that, one way or another, whether by the nature of the evidence that comes in, the arguments of counsel made to the jury, the instructions, or otherwise, under section II of *BMW*, a state cannot impose punitive sanctions for conduct that affected other states but had no impact on the plaintiff's state or its residents. "Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents." *Id.* at 572–73, 116 S.Ct. 1589. In some cases the distinction between using the evidence as it bears on reprehensibility but not as a measure of damages might

The logic and language of *BMW* suggest that if the Court were to "consider whether one State may properly attempt to change a tortfeasor's *unlawful* conduct in another state," [70] the answer would have to be "No." The Tenth Circuit, the only other Circuit to have considered the question so far, reaches that conclusion.[71] "Despite this comment we read the opinion [*BMW*] to prohibit reliance upon inhibiting unlawful conduct in other states." [72] That makes sense for two reasons. First, the core conduct in *BMW*, consumer fraud, would likely be wrongful to some degree in all states. The diversity of state approaches to consumer fraud the *BMW* Court pointed to was in part in *how* the conduct is sanctioned rather than *whether* it is permitted. The Court's discussion was in part hypothetical, conceiving of potential rather than actual diversity in treatment. The Court said a state legislature "might plausibly conclude that the administrative costs associated with full disclosure would have the effect of raising car prices to the State's residents." [73] That comment protected a hypothetical state legislature that might take a different approach from Alabama's, even if no actual legislature had taken a different position.

Perhaps most important, the variation in policies of punishment, even where the conduct is unlawful in all states, amounts to an important distinction in policy. For example, Nevada has no ceiling on punitive damages in a case such as this.[74] In this case, because the jury vindicated the rights of all Ford pickup truck drivers everywhere, Nevada has effectively imposed $70 million in punitive damages in part to protect Alaskans, among others, from failure to warn of defects in pickup trucks. But Alaska has quite a different policy on punishment by means of punitive damages: its legislature imposed a ceiling, probably $7 million in this case,[75] with fifty cents on the dollar payable to the Alaska state treasury.[76]

By imposing ten times what Alaska would allow, with all the money going to the Whites and their attorneys, rather than half of it to the state government, Nevada has created very different incentives from Alaska for manufacturers, distributors, and plaintiffs' attorneys. A manufacturer of an innovative but untried product, such as the self-tightening parking brake in this case, faces much more risk selling it in Nevada than in Alaska. A national company sometimes limits its sales according to variations in risk, as

---

be so gossamer as to be difficult for a jury to apply, but in others the significance of the distinction will be quite clear. For example, where the jury wants to punish a national manufacturer for something it did nationally, it might well be tempted to multiply the appropriate amount of punitive damages for one plaintiff by the number of hypothetical plaintiffs the jury thinks likely to be harmed. That can't be done, under *BMW*, where the award would thereby include amounts based on out-of-state victims.

70. *Id.* at 573 n. 20, 116 S.Ct. 1589.

71. *Continental Trend Res., Inc. v. OXY USA Inc.,* 101 F.3d 634, 636–37 (10th Cir.1996); *but see Owens–Corning Fiberglas Corp. v. Bal-*

lard, 739 So.2d 603, 606 (Fla.App. 4th Dist. 1998) (disagreeing with *Continental Trend's* interpretation of *BMW* on grounds that "where the defendant's conduct is considered tortious in all 50 states … the same due process concerns implicated in *BMW* do not arise").

72. *Continental Trend,* 101 F.3d at 637.

73. *BMW,* 517 U.S. at 570 n. 14, 116 S.Ct. 1589.

74. Nev.Rev.Stat. § 42.005(2) (1996).

75. Alaska Stat. § 09.17.020(g) (Lexis 2000).

76. Alaska Stat. § 09.17.020(j) (Lexis 2000).

when liability insurers pull out of high-verdict states or mail-order companies refuse orders from some states. The Nevada legislature has chosen an arguably more safety-oriented approach, the Alaska legislature a less risk-averse approach friendlier to innovation. Even though both states treat distribution of defectively designed products and failure to warn of dangerous defects as tortious, the difference in how they penalize the tortious conduct expresses significantly different policy choices.

The Supreme Court in *BMW*, speaking of BMW's being a large corporation, said "its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce. While each State has ample power to protect its own consumers, none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation." [77] This federalism concern applies strongly to the case at bar. Nevada is free, in the absence of federal legislation to the contrary, to choose a policy that may sacrifice some innovation in favor of safety, and Alaska is free to choose a policy that may sacrifice some safety in favor of innovation. Or, Alaska may think it gets more rather than less safety by limiting the penalties for innovations and economies, even though some turn out to have unanticipated risks.[78] Neither state is entitled, in our federal republic, to impose its policy on the other. If Nevada imposes an award based on vindicating a national interest in safety, as the jury was encouraged to do in this case and as the district court expressly permitted, then it may deter not only conduct tortious in other states, but also innovations and economies of production that other states have purposely tailored their laws not to discourage so strongly. Measured by the Alaska legislative policy, Nevada's policy would be overdeterrence.[79]

All of this suggests that under *BMW*, "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' ... conduct in other States," [80] whether the extraterritorial conduct is lawful or not. Though no other circuit court has yet held one way or the other, the dictum previously quoted from the Tenth Circuit takes this position,[81] and several district and state courts have so held.[82] An Eastern District of

---

77. *BMW*, 517 U.S. at 585, 116 S.Ct. 1589.

78. *See, e.g., Baker v. Exxon Corp. (In re Exxon Valdez)*, 270 F.3d 1215, 1244 (9th Cir.2001).

79. *See, e.g., BMW*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J. concurring); *In re Exxon Valdez*, 270 F.3d at 1244.

80. *BMW*, 517 U.S. at 572, 116 S.Ct. 1589 (elision is of word "lawful").

81. *See Continental Trend*, 101 F.3d at 637.

82. *See, e.g., Ace v. Aetna Life Ins. Co.*, 40 F.Supp.2d 1125, 1133(D.Alaska 1999) (reading *"BMW* case broadly enough to suggest that Alaska must leave some room within which the other states can exercise their own interests in defining the precise extent of and in deterring wrongful conduct"); *Hampton v.* *Dillard Dep't Stores, Inc.*, 18 F.Supp.2d 1256, 1276 (D.Kan.1998) ("the punitive damage award must relate to conduct occurring within the state"); *Geressy v. Digital Equip. Corp.*, 950 F.Supp. 519, 521–22 (E.D.N.Y.1997) (noting that punitive damage awards are limited by "principle of our federal system that state legislation, state policy, and judicial development of state law can only be directed at activity within the state."); *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 561 (1999) (assuming no jurisdiction condones sale of defective products, "[n]onetheless it is up to each jurisdiction to make that determination for itself.... Thus any punitive damages award should be limited to protecting this State's consumers.").

New York products liability case approves a jury instruction telling the jury it could consider "what is reasonably required to vindicate New York State's legitimate interests in punishment and deterrence, if any," [83] but that it was "not authorized to impose punitive damages to protect people outside the State of New York." [84] We agree with the Eastern District that that instruction was consistent with *BMW.*

Even if the *BMW* territorial limitation applied only to conduct lawful in other states, as opposed to unlawful conduct differently sanctioned by other states, we would be compelled to reverse because of the extraterritorial award in this case. The failure to warn found unlawful here is probably not unlawful in all states. The jury in this case found that although the brake was defective in design, that design defect did not proximately cause Walter White's death. It imposed liability for Ford's failure to warn, not for the design defect, after having been instructed that "[a] manufacturer has a responsibility to warn of a defective product after it has been manufactured and sold, if the manufacturer becomes aware of the defect."

But not all states agree with that instruction. Some impose a post-sale duty to warn, some don't. Arkansas,[85] Illinois,[86] Nebraska,[87] and Texas,[88] to name a few, do not impose a post-sale duty to warn.

Pennsylvania recognizes a post-sale duty to warn only if the plaintiff can demonstrate that the product was defective from the date of manufacture and that the manufacturer had notice of the defect.[89] Thus, while we assume that the court's instruction in this case was correct as a matter of Nevada law (which has not been challenged), it is not the law everywhere.

Even among the states that impose a post-sale duty to warn, there are differences in who is supposed to be warned. The Whites, for example, were neither purchasers nor owners of the pickup truck, so they needed a rule that a warning must be calculated to go beyond purchasers and owners to actual users. Kansas, though it requires a post-sale warning, limits the post-sale duty to warn to "ultimate consumers who purchased the product," [90] which would leave out the Whites. Thus the jury in this case was invited to award punitive damages to vindicate the interests of Ford pickup truck drivers all over the country, but the conduct for which the jury punished Ford was actually *lawful* in a number of other states.

██ *BMW* reminds us, in prohibiting just such extraterritorial punishment as was imposed in this case, that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." [91] The

**83.** *Geressy,* 950 F.Supp. at 521.

**84.** *Id.* at 524.

**85.** *Boatmen's Trust Co. v. St. Paul Fire & Marine Ins. Co.,* 995 F.Supp. 956, 962 (E.D.Ark.1998).

**86.** *Birchler v. Gehl Co.,* 88 F.3d 518, 521 (7th Cir.1996).

**87.** *Anderson v. Nissan Motor Co.,* 139 F.3d 599, 602 (8th Cir.1998).

**88.** *McLennan v. Am. Eurocopter Corp.,* 245 F.3d 403, 430 (5th Cir.2001).

**89.** *DeSantis v. Frick Co.,* 745 A.2d 624, 627–32 (2000) (defect must have existed when product left manufacturer's hands); *Sullivan v. Modern Group Ltd.,* 46 Pa. D. & C.4th 524, 530–31 (2000).

**90.** *Hiner v. Deere & Co.,* 161 F.Supp.2d 1279, 1290 (D.Kan.2001).

**91.** 517 U.S. at 573 n. 19, 116 S.Ct. 1589 (citation and internal quotation marks omitted).

district court's refusal to limit the jury to consideration of Nevada's interests, combined with the plaintiffs' lawyers exhortations to let the decision resonate "across the country," compels us to conclude that the jury here was permitted to engage in "a due process violation of the most basic sort" when it arrived at its punitive damages award. We therefore reverse the decision of the district court as to Ford's Rule 50(b) motion for a new trial on punitive damages.

Because we reverse on the ground that the punitive damages award unconstitutionally allowed a Nevada jury to punish Ford for out-of-state conduct, we do not need to address *de novo* whether these punitive damages were unconstitutionally excessive under the *BMW* guideposts, as is normally required of us by the Supreme Court's ruling in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*[92] Nor do we consider whether the award is excessive under Nevada law. On remand, the jury must decide on a punitive damages award within the territorial restraint established by *BMW*. Extraterritorial conduct is admissible for its bearing on degree of reprehensibility, but the jury must be limited to punitive damages reasonably required to vindicate Nevada's legitimate interests in punishment and deterrence, if any, and prohibited from imposing punitive damages to protect people or punish harm outside of Nevada. The jury's award on remand may yet be constitutionally excessive, or, it may be within the limits of *BMW*. We do not speak on this issue, because we need not reach it.

While we are troubled by the possibility that the jury award in this case may also have been unduly influenced by the inflammatory closing argument of the plaintiffs' attorneys, we need not reach the issue of whether the argument requires reversal, and trust that on remand the district court will take care to ensure that the proceedings are not tainted by inflammatory argument appealing to passion or prejudice.[93]

AFFIRMED as to liability determination and compensatory damages. REVERSED AND REMANDED as to punitive damages. Each party to bear its own costs on appeal.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion except as to Part 4. In my view, the majority fails to adhere to the Supreme Court's guidance in analyzing punitive damages.[1] Therefore, I respectfully dissent from Part 4 and from the remand for further proceedings.

A. *Standard of Review*

In civil cases, we generally review de novo the question whether a jury instruction misstates the applicable law. *Navellier v. Sletten*, 262 F.3d 923, 944 (9th Cir. 2001), *cert denied*, —— U.S. ——, 122 S.Ct. 2623, 153 L.Ed.2d 806 (2002). We generally review the particular formulation of civil jury instructions for abuse of discretion. *Neibel v. Trans World Assurance Co.*, 108

---

**92.** 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

**93.** *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir.1991); *see also Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 & n. 16 (9th Cir.2001) (citing *Standard Oil Co. v. Perkins*, 347 F.2d 379, 388 (9th Cir.1965)).

**1.** The Supreme Court may give additional guidance on the issues presented here when it decides *Campbell v. State Farm Mutual Automobile Insurance Co.*, No. 981564, 2001 WL 1246676 (Utah Oct. 19, 2001), *cert. granted*, —— U.S. ——, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002). Meanwhile, however, I believe that the majority has strayed from the messages sent by the Supreme Court to date.

F.3d 1123, 1129 (9th Cir.1997); *Fikes v. Cleghorn,* 47 F.3d 1011, 1013 (9th Cir. 1995); *Oviatt ex rel. Waugh v. Pearce,* 954 F.2d 1470, 1481 (9th Cir.1992). "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Swinton v. Potomac Corp.,* 270 F.3d 794, 802 (9th Cir.2001) (alteration in original) (citations and internal quotation marks omitted), *cert. denied,* 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).

Our civil cases appear to be inconsistent in describing what standard of review applies to the *denial* of a requested jury instruction. *Compare Neibel,* 108 F.3d at 1129 (reviewing for abuse of discretion the district court's decision not to deliver the defendant's requested instruction), *with Ortiz v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 852 F.2d 383, 386 (9th Cir.1988) (stating that a "defendant is entitled to an instruction if it is supported by law, and the failure to submit a proper jury instruction is a question of law which we review de novo" (citations omitted)). However, those cases can be reconciled by reviewing de novo any questions of law that are involved in the failure to give a requested instruction, for example, whether the requested instruction states the law incorrectly and whether its absence results in a misleading statement of the law. Other questions involved in the failure to give a requested instruction are reviewed for abuse of discretion, for example, whether the party's theory is adequately covered by other instructions.

### B. *The Punitive Damages Instructions*

The court gave the following instruction on punitive damages:

Members of the jury, you've now heard the evidence of the financial condition of the defendant Ford Motor Company.

Because you have answered yes to special verdict question number fifteen,[2] you may, in your discretion, award punitive or exemplary damages against defendant Ford for [the] sake of example and by way of punishment.

Your discretion should be exercised without passion or prejudice.

In arriving at any award of punitive damages, you are to consider the following: One, the reprehensibility of the conduct of the defendant; two, the amount of punitive damages which will have a deterrent effect on the defendant in light of defendant's financial condition.

That instruction is the Nevada pattern instruction, Nev. J.I. 10.20, with the appropriate modifications to identify the defendant.

The court refused to give the following instruction, requested by Defendant:

In determining the amount of punitive damages, if any, that is necessary for punishment and deterrence, you may consider only Defendant's wrongful conduct that has had an impact on the citizens of Nevada. You may not award any punitive damages for the purpose of punishing Defendant relative to the sale of vehicles in other States, or for the purpose of punishing or deterring Defendant's conduct outside the State of Nevada.

It is the court's refusal to give that particular "non-extraterritoriality" instruction on which the majority relies to reverse and remand for a new trial.

**2.** Special Verdict Question Fifteen provided: "Do you find by clear and convincing evidence that Ford acted with oppression or malice in the conduct upon which you base your finding of liability for the death of Walter White?"

# 1022

## C. *Nevada Law*

Because this is a diversity case, the first step in the analysis is to examine the fit between the instructions given and the substantive law of Nevada. "In a diversity action, or in any other lawsuit where ·state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).

The majority errs by analyzing the sufficiency of the instructions as a matter of federal substantive law in the first instance. (Majority Opinion at 1012–13, 1016.) Defendant does argue that, even if a non-extraterritoriality instruction is not constitutionally required, it is required by general federal-law principles pertaining to jury instructions. However, the Supreme Court rejected a similar argument in *Browning–Ferris*, when it declined to hold that the federal common law provides a basis for finding a punitive damages award to be excessive in a diversity case. 492 U.S. at 278–80, 109 S.Ct. 2909.[3]

The district court here sufficiently informed the jury of Nevada law on punitive damages. The court used the standard pattern instruction for Nevada. Although there are no Nevada cases analyzing whether the pattern instruction is consistent with Nevada law, a review of Nevada cases demonstrates that it is.

In Nevada, "[t]he proper end of punitive damages is to punish and deter culpable conduct." *Ace Truck & Equip. Rentals, Inc. v. Kahn*, 103 Nev. 503, 746 P.2d 132, 134 (1987). Specifically, Nevada Revised Statute § 42.005 allows a plaintiff to recover punitive damages "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, ... for the sake of example and by way of punishing the defendant." Nev.Rev.Stat. § 42.005(1).

"The amount of punitive damages appropriate to the stated purpose of punishment and deterrence lies in the discretion of the fact-finder." *Ace Truck*, 746 P.2d at 134. Nevertheless, the fact-finder's discretion is not "unbridled." *Id.* Instead, it is subject to post-verdict scrutiny by the trial and appellate courts for "legal excessiveness":

> Punitive damages are legally excessive when the amount of damages awarded is

**3.** Defendant also contends that it suffered harm from the court's failure to give its requested instruction because, even if the jury award falls within the range allowed by due process, the award might have been lower had the jury been so instructed. The argument that a failure to instruct the jury on the limitations imposed by due process violates due process, even if the resulting award in fact comports with due process, is not persuasive. As will be discussed below, a defendant's procedural due process interest is protected if punitive damages are awarded in a manner that complies with due process. A defendant's substantive due process interest is protected if the size of the award is not excessive. So long as neither of those harms occurs, a defendant has not been harmed, in a constitutionally cognizable way, by the failure to instruct. In other words, a defendant is not constitutionally entitled to a "lower" award within the range of awards that complies with due process. Cf. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151 (9th Cir.2002) (stating that usually a new trial is not required when an award of punitive damages exceeds constitutional limits. "That conclusion usually follows from the fact that a plaintiff would not be entitled to any *greater* award on remand and therefore cannot be aggrieved." The implicit corollary to that conclusion is that a defendant against whom a permissible verdict was entered would not be entitled to any *lesser* award on remand as a matter of due process, and likewise could not be aggrieved.).

*clearly* disproportionate to the degree of blameworthiness and harmfulness inherent in the oppressive, fraudulent or malicious misconduct of the tortfeasor under the circumstances of a given case. If the awarding jury or judge assesses more in punitive damages than is reasonably necessary and fairly deserved in order to punish the offender and deter others from similar conduct, then the award must be set aside as excessive.

. . . .

In arriving at the ultimate judgment of where excessiveness begins, courts can legitimately take into account any circumstances which relate to the limits of punishment and deterrence that can be properly imposed in a given case. Relevant circumstances included such matters as the financial position of the defendant, culpability and blameworthiness of the tortfeasor, vulnerability and injury suffered by the offended party, the extent to which the punished conduct offends the public's sense of justice and propriety, and the means which are judged necessary to deter future misconduct of this kind.

*Id.* at 136–37 (footnote omitted).

In view of the statute and case law, the pattern instruction adequately informed the jury of the Nevada law on punitive damages. It explained that the statutory purpose of such damages is to set an example and to punish the defendant. It clarified that the damages were not mandatory, but instead could be awarded by the jury in its discretion, a discretion that should not include passion or prejudice. The pattern instruction then identified some of the factors germane to postverdict excessiveness review, thereby limiting the jury's discretion. The instruction drew the jury's attention to the blameworthiness of Defendant's conduct and the manner in which Defendant's conduct offended the public's sense of justice and propriety by focusing on "reprehensibility." The instruction also informed the jury that the amount needed to deter Defendant should be set by reference to its financial condition.

By contrast, the instruction requested by Defendant was neither required nor supported by Nevada law. First, Defendant's statement that punitive damages must bear a reasonable relationship to compensatory damages does not state Nevada law accurately. As summarized above, Nevada law requires a punitive damages award to be "reasonably necessary" to punish the defendant for the challenged conduct and to deter others from engaging in like conduct. That is, the reasonable relationship is between the amount of punitive damages and the challenged conduct, not between the amount of punitive damages and the award of compensatory damages.

Second, Defendant's requested extraterritoriality instruction is not required by Nevada law. Nevada law does not prohibit the jury from considering a defendant's out-of-state conduct; indeed, it explicitly authorizes the jury's consideration of a defendant's financial condition, a piece of information that has an out-of-state component in many cases. Nev.Rev.Stat. § 42.005(4).

Because the instructions accurately and sufficiently summarized Nevada law, I turn next to the more difficult issues raised by Defendant: whether the Nevada instructions comply with federal due process standards. These are constitutional questions, rather than questions of instructional error. And as to such questions— including "those issues involving the proper review of the jury award by a federal district court and court of appeals"—federal law controls. *Browning–Ferris,* 492 U.S. at 278–79, 109 S.Ct. 2909.

### D. *Procedural Due Process*

In *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court articulated a standard for determining whether the *procedures* governing an award of punitive damages comply with due process. The Court held that Alabama's system of jury instructions, trial-court review, and appellate review—taken together—protected a civil defendant's due process interests. *Id.* at 20–24, 111 S.Ct. 1032.

The Court first reviewed the Alabama trial court's jury instructions on punitive damages.[4] It concluded that "[t]he instructions ... enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory." *Id.* at 19, 111 S.Ct. 1032. Consequently, the instructions imposed "reasonable constraints" on the jury's discretion, satisfying the requirements of procedural due process. *Id.* at 20, 111 S.Ct. 1032.

Second, the Court examined the Alabama procedures for post-verdict review by the trial court. *Id.* at 20, 111 S.Ct. 1032. In Alabama, the trial courts are required "to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." *Id.* (citation and internal quotation marks omitted). Factors relevant to that determination included (1) the defendant's culpability; (2) the need to discourage others from similar conduct; (3) the effect on the parties; and (4) other factors, including the effect on third parties. *Id.* The Court concluded that Alabama's system for review provided a "meaningful and adequate" check on the jury's discretion. *Id.*

Third, the Court found that the Alabama Supreme Court's review of awards of punitive damages "provide[d] an additional check on the jury's or trial court's discretion." *Id.* at 20–21, 111 S.Ct. 1032. The Alabama Supreme Court uses a two-step process to review an award of punitive damages. First, it engages in a comparative analysis of the award. It then applies the "detailed substantive standards it has developed for evaluating punitive awards."[5] *Id.* at 21, 111 S.Ct. 1032. The

---

**4.** Specifically, the instructions provided:

Now, if you find that fraud was perpetrated then in addition to compensatory damages you may in your discretion, when I use the word discretion, I say you don't even have to find fraud, you wouldn't have to, but you may, the law says you may award an amount of money known as punitive damages.

This amount of money is awarded to the plaintiff but it is not to compensate the plaintiff for any injury. It is to punish the defendant. Punitive means to punish or it is also called exemplary damages, which means to make an example. So, if you feel or not feel, but if you are reasonably satisfied from the evidence that the plaintiff, whatever plaintiff you are talking about, has had a fraud perpetrated upon them and as a direct result they were injured and in addition to compensatory damages you may in your discretion award punitive damages.

Now, the purpose of awarding punitive or exemplary damages is to allow money recovery to the plaintiffs, it does to the plaintiff, by way of punishment to the defendant and for the added purpose of protecting the public by detering [*sic*] the defendant and others from doing such wrong in the future. Imposition of punitive damages is entirely discretionary with the jury, that means you don't have to award it unless this jury feels that you should do so.

Should you award punitive damages, in fixing the amount, you must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong.

*Haslip,* 499 U.S. at 6 n. 1, 111 S.Ct. 1032.

**5.** Those standards are:

(a) whether there is a reasonable relationship between the punitive damages award

Court held that the Alabama Supreme Court's method of review supplied a "sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages." *Id.* at 22, 111 S.Ct. 1032.

In short, *Haslip* stands for the proposition that procedural due process is satisfied with respect to an award of punitive damages if procedures that provide a "definite and meaningful constraint" on the factfinder's discretion are in place to ensure that the amount of any award is reasonably related to the state's legitimate goals of punishment and deterrence. *Haslip* also makes clear that jury instructions need not limit the jury's discretion, beyond clarifying that punitive damages are discretionary and explaining their purpose, provided that postverdict review procedures are available to ensure that an award is not excessive.

In *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the Court confirmed that post-verdict review of punitive damages awards, rather than jury instructions, provides the most constitutionally significant constraint on a jury's discretion. There, the Court held that Oregon's system for awarding punitive damages violated procedural due process because it did not permit meaningful post-verdict review of punitive damages awards. *Id.* at 434–35, 114 S.Ct. 2331. In so holding, the court rejected the argument that the detailed jury instructions required by Oregon law adequately con-

strained the jury's discretion. *Id.* at 433, 114 S.Ct. 2331; *see also id.* at 440–43, 114 S.Ct. 2331 (Ginsburg, J., dissenting) (discussing the jury instructions required by Oregon law).

> Respondent's final safeguard, proper jury instruction, is a well-established and, of course, important check against excessive awards. The problem that concerns us, however, is the possibility that a jury will not follow those instructions and may return a lawless, biased, or arbitrary verdict.

*Id.* at 433, 114 S.Ct. 2331.

Read together, *Haslip* and *Honda* teach that, while due process imposes some requirements on how a jury must be instructed on punitive damages, those requirements are minimal and general. Instead, it is the availability of post-verdict review of punitive damages awards that provides the most substantial procedural check on punitive damages.

Although the Supreme Court approved the general jury instructions in *Haslip* in the context of reviewing a state court's award of punitive damages, there is no principled reason why jury instructions in a diversity case in federal court have to be more detailed. That is because the Supreme Court has established that punitive damages awards in federal court are subject to post-verdict scrutiny for compliance with both state law *and* the federal constitution.

In *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121

---

and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the

defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. *Haslip,* 499 U.S. at 21–22, 111 S.Ct. 1032.

S.Ct. 1678, 149 L.Ed.2d 674 (2001), the Court outlined the proper procedures for federal post-verdict review. When a jury awards punitive damages based on state law,

> the role of the trial judge is "to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." If no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's "determination under an abuse-of-discretion standard."

*Id.* at 433, 121 S.Ct. 1678 (quoting *Browning–Ferris Indus.*, 492 U.S. at 279, 109 S.Ct. 2909).

However, a federal appellate court must review de novo the trial court's determination of the constitutionality of a punitive damages award. *Id.* at 436, 121 S.Ct. 1678. Because "the jury's award of punitive damages does not constitute a finding of 'fact,'" this higher standard of review does not implicate the Seventh Amendment. *Id.* at 437, 121 S.Ct. 1678. The Supreme Court has directed federal appellate courts to review the constitutionality of punitive damages awards under the criteria established in *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996):

> (1) the degree or reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Cooper*, 532 U.S. at 440, 121 S.Ct. 1678.

Those post-verdict review procedures provide at least the same level of protection as the procedures approved by the Court in *Haslip*. A punitive damages award is subject to review by both the district court and the appellate court for compliance with state law, and the amount of the award is subject to de novo review to ensure that it falls within the bounds of substantive due process. Because those post-verdict procedures are at least as protective of defendants as those approved in *Haslip*, it follows that the jury instructions on punitive damages in a diversity case in federal court need to meet only the standard articulated in *Haslip* to comply with procedural due process.

Thus, in general, the *instructional* requirements are modest. Indeed, this fact has frustrated Justice O'Connor. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 474–75, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting) (noting that, while it is not necessarily unconstitutional for a jury to "receive only vague and amorphous guidance" on punitive damages, "it cannot be denied that the lack of clear guidance heightens the risk that arbitrariness, passion, or bias will replace dispassionate deliberation as the basis for the jury's verdict"); *Haslip*, 499 U.S. at 43, 111 S.Ct. 1032 (O'Connor, J., dissenting) (arguing that the jury instructions approved by the majority were unconstitutionally vague).

The Nevada instructions meet the standards articulated by *Haslip*: they informed the jury that punitive damages were discretionary, that their purpose is to punish and to set an example, and that the amount must bear some relation to the blameworthiness of the defendant's conduct. Consequently, the jury instructions met the requirements of procedural due process.

E. *The Role of Out–of–State Conduct*

In *Gore*, the Court again considered the due process limitations on awards of puni-

tive damages. According to the Court, substantive due process requires that the amount of a punitive damages award be reasonably related to the state's legitimate interests in punishment and deterrence. 517 U.S. at 568, 116 S.Ct. 1589.

The first step in analyzing whether a given award is reasonably related to the state's legitimate interests is determining the scope of those interests. *Id.* In the context of defining Alabama's legitimate interests, the Court discussed the role of a defendant's out-of-state conduct in the punitive damages calculus. *Id.* at 568–74, 116 S.Ct. 1589. The Court concluded "from ... principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its law with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572, 116 S.Ct. 1589. Instead, an award of punitive damages "must be supported by the State's interest in protecting its own consumers and its own economy." *Id.* That does not mean, however, that a jury may not consider at all the out-of-state conduct of a defendant when setting a punitive damages award. To the contrary, the Court stated explicitly that a defendant's out-of-state conduct can inform the jury's evaluation of the degree of reprehensibility of a defendant's conduct. *Id.* at 574 n. 21, 576–77, 116 S.Ct. 1589.

In view of the Court's discussion in *Gore* of the proper role of out-of-state conduct, the "non-extraterritoriality" instruction requested by Defendant is wrong as a matter of law. *Gore* simply does not require that the jury "consider *only* Defendant's wrongful conduct that had an impact on the citizens of Nevada" (emphasis added), as the Defendant's instruction proposed.

Additionally, the Nevada pattern instructions did not invite the jury to consider Defendant's out-of-state conduct in an inappropriate manner. Rather, the instructions directed the jury to consider factors such as Defendant's reprehensibility and financial position—factors that may be informed by Defendant's out-of-state conduct, but that are nonetheless proper for the jury to consider when setting a punitive damages award.

Finally, Plaintiffs' comment during closing arguments that Defendant had failed to warn 884,000 people in North America about the roll-away risk posed by its vehicles did not require the court to instruct the jury to ignore Defendant's out-of-state conduct. Defendant's counsel did not object to that aspect of Plaintiffs' closing arguments[6] and, as the Court held in *Gore*, that information was relevant to the jury's assessment of the reprehensibility of Defendant's conduct in failing to warn of the product defect.

The question remains, however, whether *Gore* required the court to give some form of non-extraterritoriality instruction, even in the absence of a properly formulated request. I believe that the answer is "no."

In *Gore*, the Court accepted the Alabama Supreme Court's interpretation of the jury's verdict as reflecting a computation based largely on activities in other states. 517 U.S. at 573, 116 S.Ct. 1589. Yet, in some of those states, the defendant's conduct was lawful. *Id.* at 569–71, 116 S.Ct. 1589. Alabama could not punish the defendant in accordance with its policy when its policy was not the same as other states' policies. As the majority opinion correctly observes, that is the same situa-

---

**6.** Defendant did object to a reference to Plaintiffs' grief and to an argument that Defendant knew that children would be the victims of its failure to warn. On appeal, Defendant con-

tinues to contend that those arguments prejudicially appealed to the passion and prejudice of the jury.

tion we face here. (Majority Opinion at 36–37.) Consequently, the majority's speculation about whether *Gore's* discussion of the scope of a state's interest in punishing and deterring extraterritorial conduct would apply when the conduct is *unlawful everywhere* is purely dictum, playing no role in the outcome of this case.[7] *See Gore,* 517 U.S. at 574 n. 20, 116 S.Ct. 1589 ("Given that the verdict was based in part on out-of-state conduct that was lawful where it occurred, we need not consider whether one State may properly attempt to change a tortfeasor's *unlawful* conduct in another State.").

After examining the legality of the defendant's conduct in some states, the Supreme Court considered what "guideposts" are required so as to ensure that a defendant receives fair notice of both the conduct resulting in punishment and the potential severity of the penalty. The three "guideposts" are the degree of reprehensibility of the nondisclosure, the disparity between the harm or potential harm suffered and the award, and the difference between the award and the civil penalties authorized or imposed in comparable cases. *Id.* at 574–85, 116 S.Ct. 1589. Significantly, however, the Court (1) discussed those factors as bearing on the excessiveness of the *actual amount* of the award, not as bearing on the *procedures* that had been followed in the Alabama trial, and (2) did not *require* a new trial even though it appears that the jury was either encouraged or allowed simply to multiply Dr. Gore's actual damages by the number of cars sold nationwide. *Id.* at 585–86, 116 S.Ct. 1589. Instead, the Court held "that the grossly excessive award imposed in this case transcends the constitutional lim-

it" and that "the appropriate remedy" might be "an independent determination by the Alabama Supreme Court of the award necessary to vindicate the economic interests of Alabama consumers." *Id.* In other words, the entire discussion was merely part of the analysis of excessiveness, and the Court took pains *not* to require either a new trial or the giving of particular instructions. *See id.* at 602–04, 116 S.Ct. 1589 (Scalia, J., dissenting) (recognizing that the logic of the majority opinion could suggest "that due process would require the assessing jury to be *instructed* " on the scope of a state's legitimate interests in imposing punitive damages relative to extraterritorial conduct, but concluding that the suggestion of a new instructional burden was a "false alarm").

*Cooper* further confirms that due process does not require that a court order a new trial on punitive damages simply because the jury may have awarded punitive damages for an inappropriate reason due to misleading instructions. In *Cooper,* the punitive damages award may have been unconstitutionally excessive because it was based in part on an improper predicate due to erroneous jury instructions. 532 U.S. at 441, 121 S.Ct. 1678. The Court remanded the case to us to apply a de novo standard of review in an excessiveness analysis under *Gore. Id.* at 443, 121 S.Ct. 1678. Notably, despite its recognition that an improper purpose may have informed the jury's decision, the Court did not hold that the defendant was entitled to a new trial on the issue of punitive damages. That result suggests that, even when a jury awards punitive damages for an im-

---

**7.** I question whether the principles articulated in *Gore* extend to a situation in which the conduct at issue is unlawful everywhere. In that circumstance, there would be no conflict with the policy goals of *any* state, and exces-

siveness review would prevent the unfairness of multiple recovery for the same wrong. As noted in text, however, we have no occasion to decide this issue.

proper purpose, the remedy is not a new trial, but instead is a reduction in the award so that it reflects only the state's legitimate interests.

Because there was no instructional error, and because Defendant received procedural due process, I turn next to an excessiveness review.

### F. *Whether the Award is Excessive*

The jury did award some punitive damages explicitly for out-of-state conduct. The jury's original award was $150 million plus $884,000. The $884,000 apparently represented "one dollar for each Ford vehicle of this type sold in North America." However, the district court reduced the award to $69,163,037.10. It computed that reduced amount by multiplying the compensatory damages by 30, on the theory that the largest punitive damages award approved by the Nevada courts had been 30 times the compensatory damages. The district court's computation thereby cured the jury's erroneous "bonus" for extraterritorial conduct.

Although the reduced award contains no extraterritoriality component, our work is not over. *Cooper* requires us to review de novo whether the reduced award is grossly excessive, applying the *Gore* factors: the degree of reprehensibility of the defendant's conduct, the disparity between the harm suffered by the plaintiff and the punitive damages award, and the difference between the award and the civil penalties authorized or imposed in comparable cases. *Cooper*, 532 U.S. at 440, 121 S.Ct. 1678. The first factor is the most significant. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. It also "presents the most difficult question for an appellate court." *Leatherman*, 285 F.3d at 1150.

In *Gore*, the Court identified the hallmarks of particularly reprehensible conduct. Nonviolent offenses are less blame-worthy than those that involve violence or the threat of violence. *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. "Similarly,'trickery and deceit' are more reprehensible than negligence." *Id.* (citation omitted). Conduct that causes economic harm alone is less reprehensible than conduct that injures (or risks injuring) the health and safety of others. *Id.* "[R]epeated misconduct is more reprehensible than an individual instance of malfeasance." *Id.* at 577, 116 S.Ct. 1589.

The conduct for which Defendant is liable here is a failure to warn. (Majority Opinion at 10–13.) Defendant knew of a potentially very dangerous defect. The defect risked injuring people, as well as causing economic harm. Yet, in part for reasons of economy, Defendant neither recalled its trucks for a 15 cent fix nor warned consumers. Defendant's conduct in failing to warn consumers of a known danger was intentional. It must be remembered that the jury found against Defendant on Plaintiffs' claim for intentional misrepresentation, so we must take it as a given that (as the district court recognized) Defendant's suppression of information amounted to an implied misrepresentation of fact · as to the truck's safety. Moreover, Defendant's misconduct was not a single act of malfeasance, but was part of an ongoing pattern of failing to warn. The first factor thus weighs heavily in favor of a significant award of punitive damages.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580, 116 S.Ct. 1589. If the harm to the plaintiff was fully realized, a court analyzes this factor by looking at the ratio of punitive damages to compensatory damages. *Id.* at 581, 116 S.Ct. 1589. Alternatively, if greater harm was likely to befall the plaintiff as a result

of the defendant's conduct, the court examines " ' "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." ' " *Id.* (quoting *TXO,* 509 U.S. at 460, 113 S.Ct. 2711, quoting *Haslip,* 499 U.S. at 21, 111 S.Ct. 1032). In *Haslip,* the Court approved an award that was four times the amount of compensatory damages. *Id.* In *TXO,* the Court compared the award of punitive damages with "the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1." *Id.*

Nevertheless, the Court has

consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine.

*Id.* at 582, 116 S.Ct. 1589 (citation omitted). That being said, the Court in *Gore* characterized the ratio at issue—500 to 1—as "breathtaking," and sufficient to arouse judicial suspicion. *Id.* at 583, 116 S.Ct. 1589.

Here, the ratio of the remitted award of punitive damages to the compensatory damages is 30 to 1. Although that ratio is not as "breathtaking" as the 500 to 1 ratio in *Gore,* it is substantially larger than the ratios approved by the Court in *Haslip* and *TXO.* Moreover, this is not a case in which a higher ratio is justified because Defendant's egregious conduct resulted in a low award of compensatory damages. Although it is difficult to conceive of a loss more terrible than the death of a child— and it is hard to value a child's life—the jury awarded Plaintiffs a substantial amount in compensatory damages: $2,305,434.57. Thus, this is not a case in which compensatory damages fail meaningfully to address a defendant's egregious conduct; nor is it a case in which it was exceptionally difficult for the jury to compute non-economic damages. Finally, because the harm to Plaintiffs has been fully realized, we need not take into account potential but unrealized harm when examining the ratio between punitive and compensatory damages.

The first two factors counsel that the Constitution requires a lower ratio of punitive damages to compensatory damages than the ratio that the district court applied. The factors justifying a higher ratio are not present. Under the circumstances, I believe that the ratio approved by the Court in *TXO*—10 to 1—would be appropriate here.

The third factor—sanctions for comparable misconduct—also weighs somewhat in favor of Defendant. As amicus points out, under the National Motor Vehicle Safety Act of 1966, the maximum civil penalty for selling defective motor vehicles is $800,000. 49 U.S.C. § 30165(a). Of course, Defendant is liable in this case not for the statutory wrong of selling a defective motor vehicle but, instead, for the tort of failing to warn of the potentially devastating consequences of the particular defect. Nevertheless this statute has some bearing on comparability. Of more import are other similar tort cases. In *Ford Motor Co. v. Ammerman,* 705 N.E.2d 539, 564 (Ind.Ct. App.1999), the court held that a jury's $58 million punitive damages award against

this same defendant in a products liability action was constitutionally excessive, but that the remitted punitive damages award of $13.8 million was constitutional. The compensatory damages in that case amounted to about $4.4 million, making the ratio of punitive to compensatory damages about 3 to 1; the unremitted, excessive ratio was about 13 to 1. *But see Romo v. Ford Motor Corp.*, 99 Cal.App.4th 1115, 122 Cal.Rptr.2d 139, 165–67 (Ct.App.2002) (upholding as constitutional a punitive damages award of $290 million where the compensatory damages were about $6.2 million, a ratio of about 45 to 1). A search of recent jury awards reveals a $120 million punitive damages award against Ford Motor Company, based on a holding that its 1988 Ford Ranger pick-up truck was defective and unreasonably dangerous; the compensatory damages amounted to just under $25 million, for a ratio of about 5 to 1. 13 Nat'l Jury Verdict Rev. & Analysis 8, *Robinson v. Ford Motor Co.* (West 2002) (1998 WL 2020336).

Applying all these factors—a concededly unscientific exercise—I conclude that a punitive damages award of $23,054,350 (10 times the compensatory damages) is the constitutional maximum here. The degree of reprehensibility of Defendant's conduct is high—Defendant intentionally failed to warn consumers of a defect that foreseeably could result in the death of a person. That failure to warn did, according to the jury's finding, result in the death of Walter White. However, the ratio of punitive damages to compensatory damages is high when compared to the ratios approved by the Supreme Court; its cases suggest that a 10 to 1 ratio is appropriate here.

Finally, the magnitude of the award when compared to awards in similar cases and analogous statutory sanctions is large,

suggesting that a smaller award is appropriate. An award of $23,054,350.00 is in line with the awards in similar cases and provides a constitutionally acceptable relationship between punitive and compensatory damages.

### G. *Conclusion*

The jury instructions on punitive damages were sufficient under Nevada law. The instructions also were sufficient to meet the requirements of procedural due process, in the context of the available procedures for review. Substantive due process does not necessarily require an instruction on nonextraterritoriality; rather, that is a factor to consider in excessiveness review. The punitive damages award in this case was excessive as a matter of substantive due process. In my view, the constitutional maximum is $23,054,350.

For the foregoing reasons, the majority's analysis of punitive damages is wanting, and it reaches an incorrect result. Accordingly, I dissent from Part 4 and from the order remanding the case for further proceedings.

